2009 UT 37

William T. JACOB, an individual; Commercial Properties, Inc., a Utah corporation; and Phillips Manufacturing Company, Inc., a Utah corporation, Plaintiffs and Appellants,

v.

B. Brett BEZZANT, an individual; Newtah, Inc., dba American Fork Citizen New Utah, a Utah corporation; and Does I–X, Defendants and Appellees.

No. 20060856.

Supreme Court of Utah.

June 16, 2009.

Randall K. Spencer, Jennifer K. Gowans, Provo, for plaintiffs.

Jeffrey J. Hunt, David C. Reymann, Salt Lake City, for defendants.

NEHRING, Justice:

## INTRODUCTION

¶ 1 William Jacob appeals a district court ruling that summarily dismissed his defamation action against Brett Bezzant. The central legal issue which we will resolve is whether Utah's Citizen Participation in Government Act, Utah Code Ann. §§ 78B–6–1401 to –1405 (2008),[1] also known as the Anti–SLAPP Act,[2] shields Mr. Bezzant from Mr. Jacob's claims. We disagree with the district court and hold that it does not. We were also asked to examine the district court's award of attorney fees to Mr. Bezzant and its dismissal of Mr. Jacob's defamation action. We reverse the district court's award of fees under the Anti–SLAPP Act but affirm the district court's dismissal of Mr. Jacob's defamation action and the award of attorney fees under 42 U.S.C. § 1988(b). Finally, we were asked to address whether Utah's Anti–SLAPP Act violates the open courts clause of the Utah Constitution. Because Mr. Jacob raised this argument for the first time on appeal and because nothing in the argument meets the threshold of exceptional circumstances, we will not address this issue.

## BACKGROUND

¶ 2 In 1992, American Fork City adopted Ordinances No. 92–05–20 and 92–05–21, which govern city employees. The ordinances stirred debate over whether they prohibited certain city employees from holding a seat on the city council. In 1997, the American Fork City attorney submitted a legal opinion to city officials concluding that the ordinances did not bar city employees from running for seats on the city council. The city attorney's legal opinion did not, however, end the debate in the minds of some, including Mr. Jacob. In 1999, Tom Hunter, who had served as a health insurance consultant for American Fork City, and Rick Storrs, who was an EMT working part-time for the city's ambulance service, decided to seek seats on the city council. The presence of Mr. Hunter's and Mr. Storrs' names on the ballot sparked controversy from those, including Mr. Jacob, who believed that the men's relationships with the city created conflicts of interest of such a degree that both should be disqualified from seeking office. Once the objections to their candidacies became known, Mr. Hunter and Mr. Storrs sought and received the city council's permission to continue their quests for seats on the council. Newspapers published articles about the potential conflicts of interest, opinions were voiced about the topic to the city council, and citizens publicly questioned Mr. Hunter about the issue.

¶ 3 Approximately a week before the election, Mr. Jacob prepared and paid for a political advertisement flyer in the American Fork Citizen New Utah!, a local weekly newspaper. Mr. Jacob's advertisement appeared in the Citizen's last issue before the election and claimed that, notwithstanding the city attorney's opinion and the city council's blessing of their candidacy, the ordinances prohibited Mr. Hunter and Mr. Storrs from holding office as city council members because they were city employees. The advertisement did not contain Mr. Jacob's name but instead was titled, "Nonpartisan Citizens Group Information Bulletin."

¶ 4 When Mr. Hunter and Mr. Storrs saw Mr. Jacob's advertisement, they complained to the Citizen's editor, Mr. Bezzant. Mr. Hunter and Mr. Storrs felt the advertisement contained false information and were frustrated because they would not have the opportunity to rebut it in the Citizen prior to the election. Mr. Bezzant then paid for and published an "Urgent Election Notice," which contained an apology to Mr. Hunter and to Mr. Storrs and reasserted that the ordinances did not bar the men's eligibility to run for the city council. The Election Notice also disclosed Mr. Jacob's identity as the author of the advertisement. Mr. Jacob claimed that the following four excerpts contained defamatory language.

---

1. The Utah Legislature recodified this section in 2008. No substantive changes were made from the earlier version, and therefore we cite to the current codification.

2. SLAPP is an acronym for a Strategic Lawsuit Against Public Participation.

(1) In fairness to Mr. Hunter and his candidacy, *New Utah!* apologizes for distributing this flyer without giving Mr. Hunter the opportunity to respond to what we believe is false and misleading information regarding his service to American Fork City.

(2) Mr. Jacob's flyer is falsely labeled as a "nonpartisan" group. Since American Fork no longer has political parties, there is no such thing as a "nonpartisan" group.

(3) Unfortunately, this flyer is a classic example of negative campaigning intended to hurt one candidate in order to favor another. We believe it hurts the entire process.

(4) Again, we apologize to Candidates Hunter and Storrs for distributing this misinformation.

Mr. Bezzant had the Election Notice distributed by mail and hand delivery to American Fork residents, which included the mayor and the city council members. Additionally, Mr. Bezzant posted the Election Notice on the newspaper's website. After receiving Mr. Jacob's bulletin, but before the print copy of Mr. Bezzant's Election Notice was circulated, a citizen attempted to bring up the subject of Mr. Jacob's bulletin during the public comment period of a city council meeting regarding fire and ambulance services but was specifically informed that no questions on the subject would be entertained.

¶ 5 Mr. Hunter and Mr. Storrs both won seats on the city council. After the election, Mr. Jacob sued Mr. Bezzant for defamation. After a series of motions, Mr. Bezzant responded to Mr. Jacob's Amended Complaint by asserting in his Answer and Counterclaim that he was shielded from liability by Utah's Anti–SLAPP Act. Utah Code Ann. §§ 78B–6–1401 to –1405 (2008). More motions followed, including a rejected attempt by Mr. Jacob to remove the case to federal court. It was not until 2004 that the district court issued its opinion granting Mr. Bezzant's Motion for Judgment on the Pleadings and/or Motion for Summary Judgment and denying Mr. Jacob's Motion to Dismiss Counterclaim. The court noted the following in its holding that Mr. Jacob violated the Anti–SLAPP Act:

[T]he evidence presented to this Court intimates that Jacob filed the litigation at issue for the purpose of chilling Bezzant's political speech and thereby preventing or interfering with Bezzant's proper participation in the process of government. The lengthy procedural history set forth in ... this opinion supports the proposition that Jacob intended to use this litigation as a means of punishing Bezzant for Bezzant's publication of the political speech contained in the election notice.

Following the dismissal of Mr. Jacob's claims, only Mr. Bezzant's counterclaims remained. Mr. Bezzant then filed a Motion for Partial Summary Judgment in which he sought an award of attorney fees and costs under Utah Code section 78B–6–1405(1)(a). The district court granted Mr. Bezzant's motion. Consistent with our decision in *Anderson Development Co. v. Tobias,* 2005 UT 36, ¶ 48, 116 P.3d 323, the district court only awarded fees and costs that were incurred after the effective date of the Anti–SLAPP Act, which was April 30, 2001. Mr. Jacob now appeals to us for relief. We have jurisdiction to hear this matter under the authority granted us in Utah Code section 78A–3–102(3)(j) (2008).

## DISCUSSION

¶ 6 Mr. Jacob asks us to review five issues. These are (1) whether Mr. Bezzant's Election Notice was "participat[ion] in the process of government" and thus shielded by the Anti–SLAPP Act, Utah Code Ann. §§ 78B–6–1401 to –1405 (2008); (2) whether the district court erred in awarding attorney fees and costs to Mr. Bezzant under the Anti–SLAPP Act; (3) whether the district court abused its discretion when it awarded Mr. Bezzant attorney fees as the prevailing party on a civil rights claim under 42 U.S.C. § 1988; (4) whether the district court erred in dismissing Mr. Jacob's claims of defamation and false light because he failed to state a claim; and (5) whether Utah's Anti–SLAPP Act is unconstitutional as applied to this case under the open courts clause of the Utah Constitution. We will address each of these issues in turn.

## I. UTAH'S ANTI–SLAPP ACT DOES NOT SHIELD MR. BEZZANT FROM MR. JACOB'S LAWSUIT

¶ 7 By its terms, Utah's Anti–SLAPP Act applies to an action that is "primarily based on, relates to, or is in response to an act of the defendant while participating in the process of government." Utah Code Ann. § 78B–6–1403(1) (2008). The Act defines process of government as "the mechanisms and procedures by which the legislative and executive branches of government make decisions, and the activities leading up to the decisions, including the exercise by a citizen of the right to influence those decisions under the First Amendment to the U.S. Constitution." *Id.* § 78B–6–1402(5).

¶ 8 At its core, Mr. Jacob's claim on appeal is that Utah's Anti–SLAPP Act does not apply to his suit against Mr. Bezzant. The district court held that "Jacob filed the litigation at issue for the purpose of chilling Bezzant's political speech and thereby preventing or interfering with Bezzant's proper participation in the process of government." The district court found that the Anti–SLAPP Act applied, impliedly holding that political speech was participation in the process of government. Whether the definition of process of government includes all political speech is a question of statutory interpretation. We review questions of statutory interpretation for correctness without giving any deference to the lower court's holding. *Carter v. Univ. of Utah Med. Ctr.*, 2006 UT 78, ¶ 8, 150 P.3d 467.

¶ 9 When the district court ruled on this case, it focused on the fact that Mr. Bezzant's Election Notice "merited First Amendment protection" because it was "political speech" discussing a "candidate's qualifications for office." Even so, although the United States Supreme Court stated that "the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office," *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971), and a California appellate court stated that "the anti-SLAPP law protects statements made by a candidate for public office and his supporters," *Beilenson v. Superior Court*, 44 Cal.App.4th 944, 52 Cal.Rptr.2d 357, 359 (1996), all political speech involving elections may not be encompassed by the plain language of Utah's Anti–SLAPP Act.

¶ 10 The district court ruled that Mr. Bezzant's Election Notice was participation in the process of government because it was political speech regarding election issues; however, the plain language of Utah's Anti–SLAPP Act is not that broad. It is not, for example, as broad as the California anti-SLAPP provision, which makes "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue" subject to a special motion to strike. Cal.Civ.Proc.Code § 425.16 (Deering 2009). In contrast, Utah's Anti–SLAPP Act limits protection of citizen participation in the process of government to "the exercise by a citizen of the right to influence" decisions of the legislature or executive branch of government. Utah Code Ann. § 78B–6–1402(5) (2008). Our only holding interpreting the reach of the Anti–SLAPP Act's public participation in the process of government definition was in the case of *Anderson Development Co. v. Tobias*, 2005 UT 36, 116 P.3d 323. Although the analysis in *Anderson* of what constitutes participation in the process of government is brief, it is a logical starting place for determining the limits of the Anti–SLAPP Act.

¶ 11 In *Anderson,* we held that citizens publicly participate in the process of government when an issue is before the city council and the citizens voice their opinion about the issue to the city council and distribute leaflets to city residents. 2005 UT 36, ¶ 50, 116 P.3d 323. In that case, a group of citizens opposed Anderson Development's proposal for a new zoning application to the South Jordan City Council. *Id.* ¶ 3. The citizens met with government officials, attended city council meetings, and distributed fliers to city residents about their opposition to the proposed development. *Id.* ¶¶ 3–5. After the city council approved the zoning change, Anderson Development sued the citizens. *Id.* ¶ 12. The citizens defended the suit in part with Utah's Anti–SLAPP Act. *Id.* ¶ 14.

We held that the citizens' "vocal opposition to [the] zoning application, which was before the City Council[ ] ... [was] sufficient to establish the element of participation in the process of government." *Id.* ¶ 50.

¶ 12 Two important factual differences between this case and *Anderson* merit our attention. First, in *Anderson,* the city council was clearly required to make a decision. It had to decide whether or not to approve Anderson Development's zoning application, but the American Fork city council had already made the decision that Mr. Hunter and Mr. Storrs were qualified candidates. In 1997, the American Fork City attorney provided a legal opinion stating that the office holder qualification ordinance did not apply to city council members. The city council followed this legal opinion before the 1999 election, and it followed this precedent for the 1999 election. Second, in *Anderson,* the citizens clearly intended to influence the city council's decision making. This was evidenced by the citizens distributing flyers to city residents urging them to attend an upcoming city council meeting and voice their opposition to Anderson Development's zoning application. Mr. Bezzant, however, addressed his Election Notice to "All American Fork Residents," and because his speech occurred in connection with the election, it appears that his intent was to provide what he viewed as the correct application of a city ordinance in order to influence voters rather than to influence the city council or the mayor. Despite the circumstances surrounding the Election Notice, Mr. Bezzant's intent would be difficult to definitively pin down.

¶ 13 Ultimately, the plain language of the definition of the process of government does not require that in all cases a party intended his actions to influence executive and legislative decision making. Rather, the language of the statute defines process of government as "the mechanisms and procedures by which the legislative and executive branches of government make decisions, and the activities leading up to the decisions, *including the exercise by a citizen of the right to influence those decisions under the First Amendment to the U.S. Constitution.*" Utah Code Ann. § 78B–6–1402(5) (emphasis added). Exercis-

ing the right to influence decision making may involve activities in addition to an intent to influence decision making.

¶ 14 In a broad sense, citizen participation in elections, including voting and political speech, influences executive and legislative decision making because government officials have the chance to hear and consider the voice of the people as demonstrated through the election process. We decline to interpret the Act so broadly. We need not and do not attempt to decide whether any speech beyond that at issue here is or is not covered by the Act.

¶ 15 When the Utah Legislature wrote the Anti–SLAPP Act, it was at liberty to define the scope of activities to be covered by it. It was free to limit the Act's applicability to particular forums and to particular means of communication, but the legislature did not choose to use either the setting or the means of communication as a criterion for assessing the applicability of the Act. Rather, the Act is fashioned to link its applicability to the context in which the action in question took place: participating in the process of government by exercising the right to influence legislative and executive decisions. The legislative branch of government makes decisions by means of votes cast by its elected representatives following deliberation and debate. Similarly, the executive branch of government makes decisions by signing or vetoing laws passed by the legislature and executing the laws through rulemaking and the exercise of its enforcement powers. Opinions and requests voiced by citizens are part of that debate and are an exercise of the citizen's rights to influence those decisions. The legislative and executive branches of government also make decisions when they decide whether to address an issue in response to a specific request to do so. An election, however, is not an exercise of the right to influence legislative and executive decision making as required by the Anti–SLAPP Act; rather, it reflects citizen decision making in the process of government as distinguished from executive and legislative decision making. That the Act does not protect speech concerning citizen decision making is demonstrated by the definition of "gov-

ernment" in the Act; it does not include "candidates" or "elections."

¶ 16 To determine whether a defendant's speech was the exercise of the right to influence legislative or executive decision making under the First Amendment, we must examine both the content of the speech and the context in which it was made. Useful factors to consider in determining whether speech was an exercise of the right to influence legislative or executive decision making are whether the speech contained express or implied intent to influence the decision-maker, whether a decision-maker was aware of the speech, whether the decision-maker was in the process of making a decision when the speech was made, or whether the decision-maker considered the speech when making the decision.

¶ 17 In this case, Mr. Bezzant's speech, although part of a public debate on the eligibility of candidates for office, was not an exercise of his right to influence legislative or executive decision making. The text of Mr. Bezzant's Election Notice apologizes to candidates Hunter and Storrs and clarifies that, as far as Mr. Bezzant is aware, they are eligible to run for city council. The Election Notice does not expressly request that the executive or legislative branch of American Fork's government take any action. Nor can it be read to impliedly request that government decision-makers act. It states that Mr. Hunter and Mr. Storrs are eligible to run as fact rather than suggesting that they should be allowed to run. Also, the record indicates that the decision-makers were not considering whether to change their long-standing policy, under which Mr. Hunter and Mr. Storrs were eligible to run. Finally, the mayor of American Fork made it clear during a city council meeting that the question of Mr. Hunter and Mr. Storrs' eligibility for office would not be addressed by the decision-makers. Later, he testified that he was not even aware of Mr. Bezzant's Election Notice when he took that position. Examining the circumstances in which the speech occurred and the content of the speech together, it is clear that Mr. Bezzant's Election Notice was not an exercise of his right to influence a decision by a legislative or execu-

tive branch of government. Rather, it provided information useful to voters in choosing whom to vote for. Because Mr. Bezzant's Election Notice was not an exercise of his right to influence a decision by a legislative or executive branch of government, it was not participation in the process of government and was not protected by the Anti–SLAPP Act. We therefore reverse the district court's holding on this issue. Accordingly, we also reverse the district court's award of attorney fees to Mr. Bezzant under the Anti–SLAPP Act.

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE CONTENT OF THE ELECTION NOTICE DID NOT CONVEY A DEFAMATORY MEANING

¶ 18 We affirm the district court's ruling that the Election Notice did not convey a defamatory meaning, but before we speak to this issue, we take a moment to clarify the standard of review associated with defamation claims that are dismissed for failure to state a claim. Mr. Jacob misstated the standard when he said that all facts and reasonable inferences must be construed in a light most favorable to him. Generally, when an appellate court reviews the district court's decision to grant a motion to dismiss for failure to state a claim upon which relief may be granted, "we accept as true all material allegations contained in the complaint and all reasonable inferences drawn therefrom." *West v. Thomson Newspapers,* 872 P.2d 999, 1004 (Utah 1994). We review these rulings under a correctness standard because whether a particular array of allegations set out a cognizable cause of action is purely a question of law. *Id.* When reviewing claims of defamation, however, a reviewing court takes a slightly different approach. As we stated in *O'Connor v. Burningham,* "the presence of the First Amendment demands a subtle although significant variation in the treatment of inferences drawn from undisputed facts." 2007 UT 58, ¶ 24, 165 P.3d 1214. The reviewing court must look to the context of the allegedly defamatory statement and then, in a nondeferential manner, "reach an independent conclusion about the statement's

susceptibility to a defamatory interpretation." *Id.* ¶ 26. Whether a statement is susceptible to a defamatory interpretation is a question of law. *Id.* Therefore, we cede no discretion to the district court's view on this question. Nor do we indulge Mr. Jacob by interpreting inferences that may be reasonably drawn from the statements in favor of a defamatory meaning. *Id.* ¶ 27. As we stated in *O'Connor*, "To accommodate the respect we accord its protections of speech, the First Amendment's presence merits altering our customary rules of review by denying a nonmoving party the benefit of a favorable interpretation of factual inferences." *Id.* Having stated the correct standard of review, we turn to the merits of the issue.

¶ 19 The district court was correct when it held that Mr. Jacob's claims of defamation and false light lacked legal merit. The district court based its decision on four independent legal defects that it found in Mr. Jacob's allegations. These defects were (1) Jacob failed to adequately plead special damages, (2) the allegedly defamatory statements are protected by Utah's public interest privilege, (3) the allegedly defamatory statements do not convey defamatory meaning as a matter of law, and (4) the allegedly defamatory statements are nonactionable statements of editorial opinion. Any one of these defects would be enough, by itself, to affirm the district court's ruling on defamation and false light. In his appeal, Mr. Jacob challenged only two of the four defects found by the district court. Notably, Mr. Jacob did not argue that the district court was wrong when it found that the statements were protected by Utah's public interest privilege and that the statements were nonactionable statements of editorial opinion. Because he has not argued that the district court erred in making these findings, Mr. Jacob concedes that his allegations of defamation suffered from these defects and therefore lack legal merit. We therefore need not address these two findings by the district court. We will, however, take up Mr. Jacob's claim that he

did not need to plead special damages because the alleged defamatory statements were defamatory per se and the alleged defamatory statements convey a defamatory meaning as a matter of law.

¶ 20 To begin, however, Mr. Jacob claims that the district court applied the wrong standard when it granted Mr. Bezzant's motion for judgment on the pleadings. Under the Anti–SLAPP suit statute, a district court, upon receipt of a motion for judgment on the pleadings, shall stay discovery and then "hear and determine the motion as expeditiously as possible with the moving party providing by clear and convincing evidence that the primary reason for the filing of the complaint was to interfere with the first amendment right of the defendant." Utah Code Ann. § 78B–6–1404(1)(b) (2008). Mr. Jacob argues that he need only establish a prima facie case to overcome the defendant's motion. He rests this assertion on a California case, *Fleishman v. Superior Court*, 102 Cal.App.4th 350, 125 Cal.Rptr.2d 383 (2002), interpreting California's anti-SLAPP law. California's anti-SLAPP law, Cal.Civ.Proc. Code § 425.16 (Deering 2009), however, is different from our own and has been interpreted much more broadly.[3] It allows a plaintiff to merely present a prima facie case in order to overcome a defendant's motion to strike a SLAPP suit. Cal.Civ.Proc.Code § 425.16(3); *Fleishman*, 125 Cal.Rptr.2d at 387–88. We need not rule on whether a prima facie case is sufficient under Utah law to overcome a motion for judgment on the pleadings because Mr. Jacob cannot even present a prima facie case.

¶ 21 A prima facie case for defamation must demonstrate that "(1) the defendant published the statements [in print or orally]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 68, 194 P.3d 956 (altera-

---

**3.** California has broadly construed "public interest" in its anti-SLAPP legislation to include not only legislative and governmental matters, but also "private conduct that impacts a broad segment of society and/or that affects a community

in a manner similar to that of a governmental entity." *Damon v. Ocean Hills Journalism Club*, 85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 212 (2000).

tion in original) (internal quotation marks omitted). A prima facie case for false light requires a plaintiff to demonstrate that (1) the defendant publicized a matter concerning the plaintiff that placed the plaintiff before the public in a false light, (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (3) the defendant knew or recklessly disregarded the falsity of the publicized matter and the false light in which the plaintiff was placed. *Stien v. Marriott Ownership Resorts, Inc.,* 944 P.2d 374, 380 (Utah Ct.App. 1997). "A false light claim is closely allied with an action for defamation, and the same considerations apply to each." *Id.* (internal quotation marks omitted).

■ ¶ 22 While it is undisputed that Mr. Bezzant published statements about Mr. Jacob, there is no evidence that the statements were false. Additionally, the statements were subject to privilege. Because Mr. Jacob did not satisfy these two elements, we need not consider fault or damages. Concerning the falsity of the statements, the district court found that Mr. Jacob did not provide evidence that Mr. Bezzant knew the statements to be false. Instead, the district court found that all of the evidence and facts supported the proposition that the Election Notice's interpretation of the city's ordinances was the city's official legal interpretation as rendered by the city's political officials and legal counsel. Additionally, the district court found that all of the statements that Mr. Jacob claims to be defamatory are nonactionable statements of editorial opinion that cannot be verified as either true or false. Because Mr. Jacob did not address this issue, we accept the statements as non-actionable editorial content that are not statements of fact. As a result, they cannot be verifiable as true or false.

■ ¶ 23 By not fulfilling this element alone, Mr. Jacob's defamation claim cannot achieve prima facie status. We take this time to affirm that Mr. Bezzant's statements were subject to privilege. Mr. Jacob was incorrect when he stated that the district court erred when it concluded that the statements were privileged. Mr. Jacob argues that defamatory publications relating to mat-

ters of public interest that are directed at private individuals are not privileged if the defendant was negligent in printing the defamatory material. Mr. Jacob confuses the issue of whether a statement is privileged with the issue of a defendant's standard of fault. In order to prove that the defendant's actions were defamatory, the plaintiff must show the defendant possessed the requisite level of fault. *See Seegmiller v. KSL, Inc.,* 626 P.2d 968, 973 (Utah 1981) (holding that "the necessary degree of fault which must be shown in a defamatory action by a 'private individual' against the media in negligence"). A defendant may avoid liability despite fault if the statement is privileged. *Id.* at 977–78. If a conditional privilege exists, the plaintiff must prove actual malice to overcome it. *Id.* at 976.

¶ 24 The district court found, and we agree, that the statements in the Election Notice are protected by Utah's public interest privilege. In *Seegmiller,* we stated that this privilege applies "when there is a legitimate issue with respect to the functioning of governmental bodies, officials, or public institutions, or with respect to matters involving the expenditure of public funds." 626 P.2d at 978. Mr. Jacob provides no evidence to refute the district court's finding that the Election Notice addressed the qualifications of Mr. Hunter and Mr. Storrs for public office and was published in the midst of a controversy over the qualifications of candidates. As a result, we can only conclude that the statements are protected by the public interest privilege.

■ ¶ 25 To defeat this conditional privilege, Mr. Jacob must prove that Mr. Bezzant's "statements were made with ill will, were excessively published, or [Mr. Bezzant] did not reasonably believe his . . . statements were true." *See Russell v. Thomson Newspapers, Inc.,* 842 P.2d 896, 905 (Utah 1992). The district court found no evidence that Mr. Bezzant acted with ill will toward Mr. Jacob. Nor did the district court find evidence that the Election Notice was excessively published. Mr. Bezzant had the Election Notice posted on the newspaper's website and hand delivered to residents of American Fork. As this was a city election, distribution to city

residents is not excessive. Finally, the district court found no evidence that Mr. Bezzant believed the statements to be false. On the contrary, he believed, correctly, that the statements were in concurrence with the city's official interpretation of its ordinances. Because the statements are not facts verifiable as true or false and were privileged, we hold that Mr. Jacob cannot present a prima facie case of defamation or false light.

¶ 26 Mr. Jacob also argues that he did not need to plead special damages because the alleged defamatory statements were defamatory per se. Because the Election Notice was written, it falls under the category of libel.[4] In *Seegmiller*, we noted that "[l]ibel is classified per se if it contains defamatory words specifically directed at the person claiming injury, which words must, on their face, and without the aid of intrinsic proof, be unmistakably recognized as injurious." 626 P.2d at 977 n. 7 (internal quotation marks omitted). Traditionally, statements that are defamation per se have been required to be false and "allege criminal conduct on the part of the plaintiff or impute the contracting of some loathsome disease, unchaste behavior (on the part of a woman) or conduct which is incongruous with the exercise of a lawful business, trade, profession, or office." *Larson v. SYSCO Corp.*, 767 P.2d 557, 560 (Utah 1989). The district court found *Seegmiller* and *Larson* to be at odds. *Seegmiller* advanced a more generous range of topics that might be considered to be defamatory per se while *Larson* reaffirms the traditional categories. The district court believed that in *Larson*, we had rejected the *Seegmiller* standard in favor of the more traditional categories. We do not find the two opinions in conflict because the *Larson* categories merely define injurious words as mentioned in *Seegmiller*. An extensive inquiry into *Seegmiller* and *Larson* is unnecessary because Mr. Bezzant's Election Notice is not defamatory under either formulation of defamation. We have also stated that "a statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West*,

872 P.2d at 1008. Mr. Jacob claims that Mr. Bezzant's Election Notice made claims of dishonesty and negative campaigning which have degraded him in society and exposed him to public hatred, contempt, and ridicule.

¶ 27 As we stated in the discussion of the standard of review for defamation claims, understanding the context in which the Election Notice was published is critical to evaluating its defamatory potential. "A court simply cannot determine whether a statement is capable of sustaining a defamatory meaning by viewing individual words in isolation; rather, it must carefully examine the context in which the statement was made, giving the words their most common and accepted meaning." *Id.* at 1009.

¶ 28 Mr. Bezzant's Election Notice was prepared and published in response to Mr. Jacob's advertisement. The advertisement challenged the eligibility of Mr. Hunter and Mr. Storrs to run for office. It concluded that Mr. Hunter and Mr. Storrs violated a city ordinance by seeking office. The advertisement was clearly motivated by a desire to persuade voters to reject the two men at the ballot box. The content of the advertisement was unequivocally political. Mr. Bezzant's Election Notice was no less political. Its content rejected Mr. Jacob's charges and apologized to Mr. Hunter and Mr. Storrs for mischaracterizing the men as being ineligible to run for the city council.

¶ 29 Political speech enjoys the broadest protection under the First Amendment. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271–72, 91 S.Ct. 621 (1971) ("And if it be conceded that the First Amendment was fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people, then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." (citation and internal quotation marks omitted)). Furthermore, as we stated above, the Election Notice constituted an editorial, which is traditionally a source of political invective. As we stated in *West*, "Newspa-

4. As opposed to slander, which is spoken.

per readers expect that statements in editorials will be more exaggerated and polemicized than 'hard news.' Readers are therefore less likely to form personal animus toward an individual based on statements made in an editorial." *West*, 872 P.2d at 1009. Mr. Jacob's advertisement and Mr. Bezzant's Election Notice were political statements made in a contentious campaign. The Election Notice was an editorial published by a local newspaper and, in such a context, was not likely to subject Mr. Jacob to hatred, contempt, or ridicule. On the contrary, it was part of the healthy political exchange that is the foundation of our system of free speech and free elections. We therefore hold that the statements in question are not defamatory per se.

¶ 30 Finally, Mr. Jacob argues that the alleged defamatory statements convey a defamatory meaning as a matter of law. "Whether a statement is capable of sustaining a defamatory meaning is a question of law...." *Id.* at 1008. As we stated above, the context of the speech is key to determining if the statement is susceptible to a defamatory meaning. *See O'Connor*, 2007 UT 58, ¶ 26. As we have discussed, the statement came within a heated political campaign. Furthermore, as Mr. Jacob has conceded, the Election Notice was an editorial. As a result, we do not find that the words used by Mr. Bezzant in his Election Notice constitute defamation as a matter of law.

¶ 31 In conclusion, we find no defamatory content in the Election Notice. Mr. Jacob failed to challenge the findings by the district court that the statements were in a nonactionable editorial and that they were protected under Utah's public interest privilege. Furthermore, Mr. Jacob's claim does not reach the threshold of prima facie case of defamation or false light. Nor does Mr. Jacob adequately argue why the district court was incorrect in finding that he did not plead special damages and that the statements in the Election Notice did not convey a defamatory meaning as a matter of law. As a result, Mr. Jacob's claims of defamation and false light are without merit.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN AWARDING MR. BEZZANT ATTORNEY FEES UNDER 42 U.S.C. § 1988(b)

¶ 32 The district court's award of fees to Mr. Bezzant pursuant to 42 U.S.C. § 1988(b) was not in error. A district court's award of attorney fees under this section is reviewed for abuse of discretion. *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir.1998). Mr. Jacob argues that the district court should not have awarded attorney fees to Mr. Bezzant when Mr. Jacob's 42 U.S.C. § 1983 claim was found to be without merit. Mr. Jacob does not appeal the district court's decision regarding the § 1983 claim; rather, he argues only that the award of fees was inappropriate. Section 1988(b) states that "[i]n any action or proceeding to enforce a provision of section[ ] ... 1983 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 1988(b) (2000). Mr. Jacob asserts that § 1988(b) includes an element of bad faith and relies on a Tenth Circuit case in which the court stated that when the plaintiff is pro se, an award of attorney fees under § 1988(b) should only be awarded if the action was meritless or without foundation. *See Houston v. Norton*, 215 F.3d 1172, 1174 (10th Cir.2000). Mr. Jacob's argument fails. Nowhere does § 1988(b) suggest that bad faith is required. On the contrary, attorney fees are presumptively awarded to the prevailing party unless special circumstances are present. *Prince v. Tooele County Hous. Auth.*, 834 P.2d 602, 604 (Utah Ct.App.1992). Mr. Jacob has not presented any special circumstances to us, and we will not seek them out.

¶ 33 Mr. Jacob also attempts to argue that he stated a prima facie case for a civil rights violation under § 1983. Rather than offering any substantive legal argument, Mr. Jacob merely makes claims of a conspiracy between Mr. Bezzant and various American Fork public officials. "When a plaintiff in a § 1983 action attempts to assert the necessary 'state action' by implicating state officials or judges in a conspiracy with pri-

vate defendants, mere conclusory allegations with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action." *Scott v. Hern,* 216 F.3d 897, 907 (10th Cir.2000) (internal quotation marks omitted). We agree with the district court that Mr. Jacob's claims are nothing more than conclusory allegations. In light of the district court's ruling in Mr. Bezzant's favor on the § 1983 claim, it was well within its discretion to award Mr. Bezzant attorney fees under § 1988(b).

## IV. MR. JACOB'S CLAIM THAT UTAH'S ANTI–SLAPP ACT IS UNCONSTITUTIONAL FAILS BECAUSE IT WAS RAISED HERE FOR THE FIRST TIME AND THERE ARE NO EXCEPTIONAL CIRCUMSTANCES THAT ALLOW US TO EXAMINE THE CLAIM

¶ 34 Mr. Jacob concludes his appeal by arguing, for the first time, that Utah's Anti–SLAPP Act violates the open courts clause of the Utah Constitution. We will not address this argument because we do not address arguments "brought for the first time on appeal unless the [district] court committed plain error or exceptional circumstances exist." *State v. Nelson–Waggoner,* 2004 UT 29, ¶ 16, 94 P.3d 186. Mr. Jacob does not allege plain error by the district court but does argue that we should review the claim under the exceptional circumstances doctrine. The exceptional circumstances doctrine applies to rare procedural anomalies, and "we have applied the exception sparingly, reserving it for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice." *Id.* ¶ 23. Such is not the case here. We find nothing in Mr. Jacob's argument that leads us to find an exceptional circumstance. We therefore decline to address this issue.

## CONCLUSION

¶ 35 We hold that Utah's Anti–SLAPP Act does not encompass all political speech regarding election issues; rather, its protection

for political speech is limited to political speech that is an exercise of a citizen's First Amendment right to influence legislative and executive decision making. In this case, the context in which Mr. Bezzant's Election Notice was published and its content demonstrate that it was not an exercise of his right to influence legislative and executive decision making. On the issue of whether the Anti–SLAPP Act applies to Mr. Jacob's suit, we reverse the holding of the district court and the award of costs and attorney fees under Utah Code section 78B–6–1405. We also hold that Mr. Jacob's defamation claims are without merit. Furthermore, we affirm the district court's award of costs and attorney fees pursuant to 42 U.S.C. § 1988(b). Finally, we do not address Mr. Jacob's argument that Utah's Anti–SLAPP Act violates the Utah Constitution because the argument was raised for the first time on appeal and there are no exceptional circumstances that allow us to review it.

¶ 36 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING'S opinion.