2014 UT App 291

THE UTAH COURT OF APPEALS

WESTMONT RESIDENTIAL LLC AND TERRY FOOTE,
Plaintiffs and Appellants,
*v.*
BRAD BUTTARS AND SARAH MILLER,
Defendants and Appellees.

Opinion
No. 20130892-CA
Filed December 11, 2014

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No. 120900896

Charles A. Schultz, Attorney for Appellants

Brad Buttars and Sarah Miller, Appellees Pro Se

JUDGE JAMES Z. DAVIS authored this Opinion, in which JUDGES
GREGORY K. ORME and KATE A. TOOMEY concurred.

DAVIS, Judge:

¶1     Westmont Residential, LLC and Terry Foote (collectively,
Westmont) appeal the trial court's dismissal of all of Westmont's
claims against Brad Buttars and Sarah Miller (collectively,
Defendants). We affirm.

BACKGROUND

¶2     Defendants sought an early termination of their one-year
"Uniform Residential Rental Agreement" (the Rental Agreement)
to rent an apartment from Westmont. Westmont required

Defendants to pay a $1,760 early-termination fee and prepared a Notice of Intent to Vacate (the Notice) that identified September 29, 2011, as the day Defendants would vacate the unit and conduct a move-out inspection with a Westmont employee. Defendants signed the Notice but did not receive a copy of the Notice until September 30, 2011.

¶3   On September 28, Westmont Residential's manager, Terry Foote, entered Defendants' unit to investigate an odor reported by another tenant in the same building. The complaining tenant also reported that he had not seen Defendants for two weeks. Foote knocked on Defendants' door, and after no one answered, Foote entered the unit without attempting to call Defendants. Inside, he observed that most of Defendants' belongings had been removed from the unit and that the unit was "filthy."

¶4   On September 29, a Westmont employee went to Defendants' apartment to conduct the scheduled move-out inspection. Defendants were not there, and the employee proceeded to enter the apartment without confirming whether office personnel were able to contact Defendants. Defendants had mistaken September 30 as the scheduled move-out and inspection date.

¶5   On September 30, around 10:30 a.m., Defendants arrived at the apartment intending to clean the unit and finish removing their belongings. Instead, they found Westmont employees cleaning the unit and boxing up Defendants' property. Westmont refused to let Defendants enter the unit to retrieve their property and instead finished packing Defendants' items, stored the boxes in a carport, and demanded that Defendants pay a $100 "Packing and Inventory" fee before Westmont would allow Defendants access to their belongings. Defendants paid the fee and were allowed to retrieve their items. Shortly thereafter, on October 19, 2011, Miller posted a review in an online forum describing Westmont as "'crooks'" that "'will take full advantage of you! Run from them!'"

¶6     Westmont filed a complaint against Defendants seeking to recover $2,169 in damages for the costs of cleaning and repairing the unit, plus $216.90 as a "10% repair and cleaning miscellaneous supplies charge." Westmont also brought a claim for defamation per se against Defendants arising out of the online review.

¶7     After a bench trial, the trial court denied all of Westmont's claims for damages, and in its ruling on Westmont's post-trial motions, the court noted that Defendants "genuinely believed that they had another day to complete moving out," particularly because they "returned to the unit the next day in an attempt to finish moving out, and had paid the entire months rent." Therefore, the court ruled that Defendants were not responsible for any of Westmont's alleged cleaning fees, because "Westmont prematurely conducted the move-out inspection and began cleaning the apartment without giving Defendants the opportunity to finalize their move-out." The court determined that Defendants were liable for only $50 of Westmont's alleged cost of repairs and reduced the related 10% surcharge to $5. However, the court concluded that Defendants' liability for $55 in damages was offset by Westmont's impermissible charge of $100 for inventorying and packing Defendants' belongings. As a result, Westmont was awarded no damages. The court also dismissed Westmont's defamation per se claim, concluding that Defendants' "mere use of the word 'crooks'" did not justify "application of the defamation per se doctrine" and that Westmont could not otherwise prove that it was actually harmed by the online comment.

¶8     Westmont subsequently filed a motion to disqualify the trial judge, a rule 59 motion to alter or amend the judgment, and a rule 60(b) motion for relief. All three motions were denied. Westmont now appeals.

ISSUES AND STANDARDS OF REVIEW

¶9      Westmont raises several issues on appeal. First, it challenges the trial court's finding that Defendants had not vacated the apartment as of September 29. "Because a trial court is in a better position to judg[e] credibility and resolv[e] evidentiary conflicts, an appellate court reviews the trial court's findings of fact for clear error." *State v. Levin*, 2006 UT 50, ¶ 20, 144 P.3d 1096 (alterations in original) (citation and internal quotation marks omitted).

¶10     Next, Westmont argues that the trial court erred in determining that Defendants' online review did not constitute defamation per se. "Because the existence of defamatory content is a matter of law, a reviewing court can, and must, conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation." *O'Connor v. Burningham*, 2007 UT 58, ¶ 26, 165 P.3d 1214.

¶11     Westmont also challenges the trial court's denial of its rule 59 and rule 60(b) motions and the trial judge's failure to recuse himself before ruling on Westmont's post-trial motions. Because we determine that all three of these arguments are inadequately briefed, we do not reach their merits. *See* Utah R. App. P. 24(a)(9).

ANALYSIS

I. Challenged Findings

¶12     Westmont first challenges the trial court's determination that "because Defendants had not vacated or given up possession of [their unit] on September 29, 2011," "Westmont did not have the right to perform the move-out inspection at the time [it] did, [and] . . . did not have the right to charge a $100.00 fee for packing and

inventorying Defendants' remaining belongings." Westmont approaches this issue from two angles. First, it asserts that the Notice operated as an addendum to the Rental Agreement by which the expiration date of the Rental Agreement was amended to September 29, 2011. Thus, "when September 29, 2011, came and passed, without [Defendants] appearing for the Move-Out Inspection, they vacated" their unit by operation of the terms of the amended Rental Agreement.

¶13    Second, Westmont argues that the nature of the items left behind by Defendants proves that Defendants had vacated the unit as of September 29, 2011. Westmont characterizes the items as "trash" and "junk." We address each argument in turn.

A.    The Notice of Intent to Vacate Did Not Modify the Rental Agreement.

¶14    The Rental Agreement provides, "This form constitutes the entire agreement made between the parties and may be modified only in writing signed by both parties." Westmont's argument rests on its assumption that because the Notice was signed by both Defendants and a representative of Westmont, the Notice necessarily became an amendment to the Rental Agreement. The trial court acknowledged that Defendants and a Westmont representative signed the Notice, that the Notice scheduled the move-out date and move-out inspection for 2:00 p.m. on September 29, 2011, and that the Rental Agreement could be modified by a writing signed by both parties. Nonetheless, the court concluded that the Notice was not a modification of the Rental Agreement.

¶15    "A valid modification of a contract . . . requires a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness." *Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 373 (Utah 1996) (citation and internal quotation marks omitted); *see also Scott v. Majors*, 1999 UT

App 139, ¶ 16, 980 P.2d 214 (explaining that to "alter, or supplant a contract fairly made," "[t]he same meeting of the minds is needed that was necessary to make the contract in the first place" (emphasis, citation, and internal quotation marks omitted)). The party claiming that there has been a modification to a contract—here, Westmont—carries the "burden of proof for showing the parties' mutual assent" to the modification. *See Harris v. IES Assocs., Inc.*, 2003 UT App 112, ¶ 46, 69 P.3d 297.

¶16    In reaching its conclusion, the trial court relied on a particular provision of the House Rules, a separate document incorporated by reference into the Rental Agreement. The specific provision cited by the court—paragraph 10 of part 1—requires tenants to give up possession of the apartment before Westmont can perform a move-out inspection. The provision states, "If the Rental Unit is not officially vacated at the specified time, rent will be charged until all keys have been surrendered, and a move-out walkthrough is completed and signed by the resident and by management or management's representative." The trial court reasoned, "Nothing in this provision indicates that it does not apply when a tenant does not vacate a unit prior to a scheduled move-out inspection pursuant to a Notice of Intent to Vacate" and "nothing in the Notice of Intent to Vacate purports to 'modify' this provision."

¶17    Westmont argues that the trial court's reliance on part 1, paragraph 10 of the House Rules is misplaced. It asserts that this provision "undeniably" "is not intended to apply to a situation where a tenant is not present for a scheduled Move-Out-Inspection, and has not made any effort to reschedule the Move-Out-Inspection," and that the court's interpretation creates an untenable situation in which "all of Westmont's apartments would be empty, and Westmont would still be charging the tenants who failed to attend the Move-Out[] Inspections rent, while Westmont

is required to wait 'until all keys have been surrendered, and a move-out walkthrough is completed and signed.'"

¶18    We do not agree that the provision is "undeniably" inapplicable here or that the trial court's interpretation would result in the scenario proposed by Westmont. And Westmont does not otherwise direct us to any evidence or address any related legal authority to support its position. Rather, it takes a broken-record approach and simply repeats its conclusory argument that the Notice amended the Rental Agreement because it comported with the requirements established in the Rental Agreement's integration clause. Westmont's repetition of its argument does not establish the argument's validity. Accordingly, Westmont has failed to show error in the trial court's ruling that the Notice did not modify the Rental Agreement.[1]

B.    Defendants' Belongings Are Not Trash.

¶19    Next, Westmont argues that the items that remained in Defendants' apartment as of September 29 were of the quality and type that, based on Westmont's experience in the "industry," are often left behind by tenants that have abandoned their unit, rendering the items "junk" and "trash." As a result, Westmont asserts that it was not required to wait until Defendants "remove[d] all of their trash from" the unit before it could conduct a move-out inspection or begin repairing and cleaning the apartment. The trial court acknowledged Westmont's

---

1.  Westmont's remaining arguments against the trial court's reliance and interpretation of other provisions in the House Rules are dependent upon Westmont's conclusion that Defendants had vacated the unit. Because we affirm the trial court's rulings to the contrary, we need not address Westmont's additional arguments related to the House Rules.

characterization of Defendants' remaining belongings as "junk" and concluded that regardless of whether Westmont "valued Defendants' possessions, the law does." *Cf. Martin v. City of Indianapolis*, 192 F.3d 608, 615 (7th Cir. 1999) (Manion, J., concurring in part and dissenting in part) (recognizing in the context of public art that, oftentimes, "one man's junk is another man's treasure").

¶20   The court described the items in the apartment as carrying "significant importance and expense, especially for a young newly married couple." Additionally, the court explained that Westmont's "complete disregard for the value of Defendants' belongings" undermined Westmont's credibility in "accurately describ[ing] the state of the [apartment], or the amount of time it took to clean it." What's more, the fact that Westmont took the time to package Defendants' belongings into boxes and the fact that Defendants paid $100 to retrieve those boxes negates Westmont's assertion that the items left behind amounted to abandoned garbage. As a result, Westmont has not convinced us that the trial court's rejection of this argument was clearly erroneous.

## II. Defamation Per Se

¶21   Westmont next challenges the trial court's conclusion that Defendants' statements in their online review of Westmont did not constitute defamation per se. The trial court found, "On October 19, 2011, Miller posted a review on YAHOO! LOCAL stating her belief that Westmont Properties, its management, and employees, were 'crooks and will take full advantage of you! Run from them!'"

¶22   "Traditionally," in order to constitute defamation per se, the challenged statements must "be false and allege criminal conduct on the part of the plaintiff . . . or conduct which is incongruous with the exercise of a lawful business, trade, profession, or office." *Jacob v. Bezzant*, 2009 UT 37, ¶ 26, 212 P.3d 535 (citation and internal

quotation marks omitted). A party does not need to plead special damages in pursuing a defamation per se claim because damages are presumed so long as the "injurious character" of the challenged word is obvious. *Western States Title Ins. Co. v. Warnock*, 415 P.2d 316, 317 (Utah 1966). To determine if "a statement is capable of sustaining a defamatory meaning," the reviewing court "must carefully examine the context in which the statement was made, giving the words their most common and accepted meaning." *West v. Thomson Newspapers*, 872 P.2d 999, 1009 (Utah 1994). "'A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.'" *Id.* (quoting *Towne v. Eisner*, 245 U.S. 418, 425 (1918)); *see also Prince v. Peterson*, 538 P.2d 1325, 1327–28 & n.4 (Utah 1975) (noting that "simply making some general statement about another being a crook, or even using profanity against [another] in a general way, may not be actionable . . . depend[ing] on the circumstances").

¶23    The trial court described Defendants' post as an "obscure online review" and stated that Westmont provided no evidence as to how widely it was accessed, how long it was available on the web, or how significantly, if at all, it differed from the "several [other] postings on the internet critical of Westmont's business practices." In light of that context, the court concluded that Defendants' "mere use of the word 'crooks'" did not justify "application of the defamation per se doctrine." The court recognized that the term "crooks" "could merely be a reference to crooked behavior, not a direct violation of the criminal code," or that it "could be a term for a person that has taken advantage of another," which "many would agree describes Westmont's

conduct."[2] *See West*, 872 P.2d at 1007–08 (noting that the falsity of a statement is an element of defamation).

---

2. For example, in its ruling on Westmont's post-trial motions, the trial court pointed out that Westmont attempted to collect fees for cleaning three windows and window sills in the living room "when the photographs of the living room . . . show that [only] one window existed." Indeed, because the truth of the allegedly defamatory statements is a total bar to recovery on a claim for defamation per se, it is also worth noting that this is not the first time Westmont has been called a crook and pursued questionable trial tactics, nor is it the first time Westmont has pursued a defamation per se cause of action. *See Westmont Mirador, LLC v. Miller*, 2014 UT App 209, ¶¶ 1 n.1, 5, (noting that former tenants' online comment describing Westmont as "'crooks' and 'scam artists'" warranted nominal damages on a claim of defamation per se purely as a result of the tenants' default and recognizing that "nominal damages are appropriate 'when the insignificant character of the defamatory matter, or the plaintiff's bad character, leads the [factfinder] to believe that no substantial harm has been done to his reputation, and there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation'" (alteration in original) (quoting Restatement (Second) of Torts § 620 cmt. a (1977))); *Westmont Mirador LLC v. Shurtliff*, 2014 UT App 184, ¶ 13, 333 P.3d 369 (observing that Westmont failed in "its primary goal at trial," which "was to disprove 'libelous statements' that Westmont had forged the [former tenants'] signatures on [a pet addendum]"); *Westmont Maint. Corp. v. Vance*, 2013 UT App 236, ¶¶ 7 n.4, 22, 313 P.3d 1149 (recognizing that the trial court awarded attorney fees as a sanction against Westmont for filing a defamation claim against an attorney representing former Westmont tenants and noting the trial court's observation that the defamation case was an "'egregious and unwarranted use of legal process, a waste of judicial resources, and an undue imposition upon'" the tenants' attorney).

¶24 We agree with the trial court. While we acknowledge that the term "crooks" can carry a criminal connotation, in the context of Defendants' online review, the term is clearly not being used in this manner. Indeed, given the context here of an online forum intended for consumers to review local businesses, we are convinced that "even the most careless reader [would] perceive[] that the word ['crooks'] was no more than rhetorical hyperbole." *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (addressing the term "blackmail"). And rhetorical hyperbole, including "juvenile name-calling," *Krinsky v. Doe 6*, 72 Cal. Rptr. 3d 231, 249 (Cal. Ct. App. 2008), is not defamatory because it cannot "reasonably [be] interpreted as stating actual facts," *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50 (1988); *see also Krinsky*, 72 Cal. Rptr. 3d at 248–49 (concluding that posts in a heated internet discussion that referred to one officer of a corporation as a "'mega scum bag,'" called other officers "cockroaches," "'boobs, losers and crooks,'" and described another as having "'fat thighs, a fake medical degree, . . . and . . . poor feminine hygiene'" were vulgar but not defamatory because "nothing in [the] post suggested that the author was imparting knowledge of actual facts to the reader").

¶25 In other words, "[e]xaggerated language used to express opinion, such as 'blackmailer,' 'traitor' or 'crook,' does not become actionable merely because it could be taken out of context as accusing someone of a crime." *Hodgins v. Times Herald Co.*, 425 N.W.2d 522, 527 (Mich. Ct. App. 1988) (citing *Greenbelt*, 398 U.S. at 14). Accordingly, we affirm the trial court's dismissal of Westmont's defamation per se claim.

### III. Post-trial Motions and Recusal

¶26 Westmont also challenges the trial court's denial of its rule 59 motion and its rule 60(b) motion and the trial judge's failure to recuse himself before ruling on the post-trial motions. The Utah Rules of Appellate Procedure require an appellant "to clearly define the issues and provide accompanying argument and

authority[ because] a reviewing court is not simply a depository in which the appealing party may dump the burden of argument and research." *State v. Honie*, 2002 UT 4, ¶ 67, 57 P.3d 977; *see also* Utah R. App. P. 24(a)(9). All three of these challenges fail to satisfy our appellate briefing rules.

¶27    Westmont's challenge to the trial court's denial of its post-trial motions is based entirely on its repetition of its earlier argument that Defendants had vacated the unit by September 29, 2011, per the terms of the Rental Agreement, as amended by the Notice. Unsurprisingly, we are not persuaded by this encore iteration of an argument we have already rejected. *Engle v. Isaac*, 456 U.S. 107, 146 (1982) (Brennan, J., dissenting) (noting that an argument that was previously rejected as "offend[ing] common sense," "does not become less offensive by sententious repetition" (internal quotation marks omitted)). Likewise, Westmont's cursory challenge to the trial judge's failure to recuse himself before ruling on Westmont's post-trial motions is undeveloped and contains no citations to relevant legal authority and record material. Because these arguments do not satisfy our briefing requirements and accordingly cannot carry Westmont's burden to show error, we do not address them further. *See* Utah R. App. P. 24(a)(9).

CONCLUSION

¶28    The trial court's findings supporting its conclusion that Defendants had not vacated their apartment as of September 29, 2011, are not clearly erroneous. Likewise, Defendants' use of the term "crooks" in an online review does not constitute defamation per se. Westmont's remaining arguments concerning its post-trial motions and the trial judge's obligation to recuse himself from ruling on those motions are inadequately briefed. Accordingly, we affirm.