*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 37**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STUART MACKEY,
*Appellee,*

*v.*

JASON KRAUSE,
*Appellant.*

No. 20240785
Heard May 13, 2025
Filed August 28, 2025

On Direct Appeal

Third District Court, Salt Lake County
The Honorable Elizabeth A. Hruby-Mills
No. 230909102

Attorneys:

Ryan B. Bell, Marcia Fuller Durkin, Salt Lake City, for appellee

Douglas B. Thayer, Justin T. Rich, Jessica Griffin Anderson, Lehi, for appellant

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1    Stuart Mackey sued Jason Krause, the parent of one of Mackey's former students. Krause had complained publicly about Mackey and his pedagogical demeanor after Mackey reprimanded Krause's son. Mackey contends that Krause not only defamed him but that Krause caused him emotional distress, abused legal processes, and intentionally interfered with his economic interests.

¶2 Utah's Uniform Public Expression Protection Act (UPEPA) allows a defendant to seek an early dismissal of certain claims by filing a special motion for expedited relief. Krause availed himself of that opportunity, but the district court denied the motion. The court ruled that UPEPA does not apply to Mackey's claims, and that even if it did, the causes of action could survive the early challenge.

¶3 Krause asserts that the district court erred in four ways. Krause first argues that UPEPA applies to Mackey's claims. He next contends that the court erroneously viewed the facts and all reasonable inferences drawn from the facts in Mackey's favor. He then maintains that Mackey failed to establish a prima facie case as to each claim, as UPEPA requires. Krause last argues that he satisfied his burden to show that Mackey's claims were legally unsound.

¶4 The district court misread the statute when it held that Krause failed to establish that UPEPA applies to Mackey's claims. The court properly viewed the facts and all reasonable inferences drawn from the facts in Mackey's favor, but it erred when it concluded that Mackey had stated a prima facie case as to each of the complaint's causes of action. When we look at the allegations and the evidence before the district court, we can see that Mackey failed to state a prima facie case of intentional infliction of emotional distress (IIED) and of abuse of process. The district court should have dismissed those claims.

¶5 We remand Mackey's defamation and tortious interference claims to the court to reconsider whether Mackey stated prima facie cases with respect to them. On remand, the court shall also award costs, reasonable attorney fees, and reasonable litigation expenses related to the motion in accordance with UPEPA. All told, we reverse in part, vacate in part, and remand.

## BACKGROUND[1]

¶6 In 2021, the Utah Military Academy (UMA), a public charter school, hired Stuart Mackey, a United States Air Force

---

[1] We view the facts and draw reasonable inferences from the facts in a light most favorable to Mackey. *See Christensen & Jensen, P.C. v. Barrett & Daines*, 2008 UT 64, ¶ 19, 194 P.3d 931. But we do not grant the "inferences that may be reasonably drawn from the

(continued . . .)

veteran, as a Junior Reserve Officer Training Corps and marksmanship instructor.

¶7   One day in September 2022, Mackey's marksmanship students, sometimes called cadets, were not listening to Mackey. Mackey asked Cadet Krause, who had been "instructing other [c]adets in technique and correcting their position and fundamentals," to step into the hallway. Once there, Mackey reprimanded Cadet Krause for his behavior and told him he was no longer marksmanship team captain. Cadet Krause quit the team.

¶8   Shortly after this exchange, Cadet Krause called his father, Jason Krause, to tell him what had happened. Mackey alleges that Krause, displeased with Mackey's treatment of his son, "began a smear campaign intended to remove . . . Mackey from his position at UMA." Mackey maintains that Krause's actions demonstrate his "clear animus" against Mackey.

¶9   Krause initiated this "campaign" during a September 2022 parent-teacher conference between Jakob Ellinger (UMA's then-principal), Mackey, and Krause. Krause found the conference unproductive. Mackey alleges that Krause escalated his concerns about Mackey to Superintendent William (sometimes Bill) Orris.

¶10  In December 2022, Krause attended a UMA school board meeting. Krause addressed the board during the public comment portion. Mackey alleges that Krause

> a. Claim[ed] there were "8 different instances, some physical some not, with an individual and [c]adets" where a faculty member had behaved inappropriately;
>
> b. Assert[ed] that "there [was] a group of people—parents, in 30 days if we do not have some kind of reconciliation there will be action taken" related to this faculty member;
>
> c. [Threatened] that "there will be legal and also law enforcement" action taken if the administration does not address the issues with the specific faculty member to [his] satisfaction.

---

statements in favor of a defamatory meaning." *Jacob v. Bezzant*, 2009 UT 37, ¶ 18, 212 P.3d 535; *see infra* ¶ 56.

d. [Stated] [w]hen asked whether the supposed 8 instances included physical contact with students, . . . that there were "three instances I will say in the meeting . . . ," implying that there were at least three instances where this specific faculty member was involved in a physical altercation with a [c]adet.

Krause also said, "Bill, I mentioned to you before, I'm not giving you the details yet," though Krause maintains that he never discussed Mackey with Orris before the meeting (and Orris does "not recall" whether he did).[2] During his remarks, Krause did not identify Mackey by name.

¶11 Three days later, Orris called Krause. Krause informed Orris that he had been referring to Mackey in the meeting. Orris recalled that Krause also "gave [him] the names of the alleged [two or three] victims and what act had been perpetrated on them." The first allegation was that Mackey picked up a rock on his desk and threw it at a student, hitting the student in the "stomach, rib cage area." The second was that Mackey wrestled with a student and put him in a headlock. Mackey proceeded to give the second student a "knuckle rub" on the top of his head and then threw him across the room over several desks into the wall. Krause learned about both incidents from his daughter, who, like Cadet Krause, was a student at UMA.

¶12 Orris placed Mackey on administrative leave pending an investigation. Joseph Schino, UMA's Interim Principal, informed Mackey of this decision. The next day, however, UMA fired Mackey. UMA did not tell him why he had been terminated.[3]

¶13 Krause and Orris met in person a few days later. The purpose of the meeting, according to Orris, was for Krause to provide him with more details about the incidents they had

_____

[2] It bears noting that UPEPA permits a party to ask the court for leave to engage in limited discovery related to the special motion UPEPA authorizes. *See* UTAH CODE § 78B-25-104(4). The district court granted Mackey's request for discovery and permitted him to, among other things, take Orris's deposition.

[3] In October 2022, Schino issued Mackey a "formal warning" concerning "insensitive and inappropriate comments." That same month, Mackey had also been the subject of an incident report alleging "unprofessional behavior."

discussed on the phone. Krause repeated the allegations that Mackey had thrown a rock at a cadet and that Mackey had thrown a student over desks and into a wall.

¶14 After that meeting, Krause emailed Orris a file he had created titled "Mackey." The document contained a "Stuart Mackey Case Timeline." It began with Mackey's September 2022 verbal reprimand of "Student 1," presumably Cadet Krause, and ended with Krause's December 2022 private meeting with Orris. Under a heading labeled "Additional Notes," Krause remarked that "Mackey clearly has no boundaries and is a troubled individual. He needs help, needs accountabilities." Under "Risk Assessment," Krause listed, "[Narcissistic] personality disorder," "Entitlement mentality," "Bipolar disorder," and "High risk to children."

¶15 There is also a section bearing the heading "Interview List." Mackey alleges that Krause interviewed the individuals Krause placed on the list, yet Krause maintains that the list "was, at most, a list of individuals Krause was suggesting Orris could potentially reach out to, as part of any investigation." Regardless, the list contains allegations that "Mackey verbally assaulted a handful of . . . UMA students and parents" and "repeat[s] the allegations that . . . Mackey physically assaulted two UMA cadets."

¶16 Mackey alleges that Krause then "made a false report to Lehi City Police disparaging" Mackey. Mackey explains, "In that report, Mr. Krause falsely alleged that . . . Mackey lost his temper in class and picked . . . up [a rock] and threw it intentionally at a UMA Cadet, hitting the Cadet in the ribcage." According to Mackey, Krause further shared that "the Cadet reported to his classmates that he was hurt and may have sought medical treatment for his injury."

¶17 Lehi police contacted the father of the cadet Mackey had allegedly assaulted with a rock. The cadet "clarified" that "Mackey often held a rock that had been gifted to him by a Cadet and joked about throwing it at Cadets." The alleged victim also explained that one day at school, Mackey "raised the rock[,] and the rock simply fell out of . . . Mackey's hand and hit the floor, causing the rock to bounce up and come into harmless contact with this Cadet." After

the cadet relayed that the rock did not injure him, the Lehi police "closed their case . . . against" Mackey.[4]

¶18 Orris contacted the Utah Division of Child and Family Services (DCFS). His report outlined, among other things, the incidents Krause and Orris discussed on the phone. DCFS opened an investigation into Mackey. Mackey alleges that as part of that investigation, DCFS interviewed the cadets at the center of the allegations. "Cadet 1 . . . reported that he was not hurt by the rock hitting his side and the incident did not leave any mark." And "Cadet 2 admitted that there had been an incident where [he] lost his balance at UMA and tripped over a table," but he "denied that . . . Mackey had any role in causing" the student to trip. DCFS eventually decided to close its investigation.

¶19 Mackey sued Krause, asserting claims for defamation, IIED, abuse of process, and tortious interference. Mackey based each cause of action on statements Krause made about Mackey, including, but not limited to, that Mackey "engag[ed] in child abuse"; "engag[ed] in 8 different instances of inappropriate behavior with UMA [c]adets, including some inappropriate physical altercations"; and "had an explosive personality and had access to weapons." Mackey alleges that "as a result of Mr. Krause's orchestrated campaign against him," he "has lost substantial income . . . and has suffered additional damages to his well-being and emotional stability."

¶20 Krause filed a special motion for expedited relief under UPEPA, seeking dismissal of Mackey's claims. *See* UTAH CODE § 78B-25-103. UPEPA directs that when faced with such a motion, "the court shall consider the pleadings, the motion, any reply or response to the motion, and any evidence that could be considered in ruling on a motion for summary judgment under Utah Rules of Civil Procedure, Rule 56." *Id.* § 78B-25-106.

---

[4] Krause filed a Government Records Access Management Act request for records with the Lehi Police Department, presumably looking for a communication from Krause that spawned the investigation. The police department responded that it had "[n]o records . . . for Jason Krause."

¶21 The statute also provides the following instruction:

> In ruling on a motion under Section 78B-25-103, the court shall dismiss with prejudice a cause of action, or part of a cause of action, if:
>
> (a) the moving party establishes under Subsection 78B-25-102(2) that this chapter applies;
>
> (b) the responding party fails to establish under Subsection 78B-25-102(3) that this chapter does not apply; and
>
> (c) either:
>
> (i) the responding party fails to establish a prima facie case as to each essential element of the cause of action; or
>
> (ii) the moving party establishes that:
>
> (A) the responding party failed to state a cause of action upon which relief can be granted; or
>
> (B) there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

*Id.* § 78B-25-107(1).

¶22 UPEPA applies to a cause of action asserted in a civil action against a person based on the person's

> (a) communication in a legislative, executive, judicial, administrative, or other governmental proceeding;
>
> (b) communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or
>
> (c) exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or Utah Constitution, on a matter of public concern.

*Id.* § 78B-25-102(2).

¶23 UPEPA permits a court to "allow limited discovery if a party shows that specific information is necessary to establish whether a party has satisfied or failed to satisfy a burden under

Subsection 78B-25-107(1) and the information is not reasonably available unless discovery is allowed." *Id.* § 78B-25-104(4). The statute also directs courts to "award court costs, reasonable attorney fees, and reasonable litigation expenses related to the motion." *Id.* § 78B-25-110.

¶24 The district court denied Krause's motion. The court noted that the Legislature had recently enacted UPEPA and lamented that "there is no precedent upon which [it could] rely to assist in determining the applicability of UPEPA here."

¶25 The court's order focused on whether (1) Krause established that UPEPA applies to Mackey's causes of action; (2) Mackey stated a prima facie case as to each essential element of his causes of action; and (3) Krause showed that Mackey's claims lacked legal viability. The court interpreted UPEPA to instruct courts reviewing special motions for expedited relief "to use the same analysis employed when deciding motions for summary judgment" under rule 56 of the Utah Rules of Civil Procedure. Accordingly, the court "view[ed] the facts and reasonable inferences drawn therefrom in a light most favorable to" Mackey. (Quoting *Sur. Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 37, 10 P.3d 338.)

¶26 The court first concluded that Krause failed to establish that UPEPA applies to Mackey's claims. The court determined that Mackey's lawsuit was "based on conduct that was not part of any discussion at a governmental proceeding," so Utah Code subsection 78B-25-102(2)(a) did not apply. Utah Code subsection 78B-25-102(2)(b) also did not apply, according to the court, because Krause's statements at the UMA board meeting were "made during a public comment period and the concerns he raised were not issues that were being deliberated or considered at the meeting." The court additionally concluded that Krause's investigation and comments at the board meeting did not deal with "a matter of public concern," as that term is used in the statute. *See* UTAH CODE § 78B-25-102(2)(c).

¶27 Even though the court decided that UPEPA was not implicated, it proceeded to analyze Mackey's complaint to determine whether it could survive the UPEPA special motion. The court determined that Mackey established a prima facie case for each cause of action.

¶28 The court also concluded that Krause failed to demonstrate that Mackey's claims lacked legal viability. The

district court believed that "it is the [d]efendant who has the burden of proving a privilege applies." The district court rejected Krause's arguments that his statements are "subject to the legislative proceeding privilege and . . . conditional privileges," and that Mackey's "complaint did not include sufficient facts to overcome the conditional privileges." Because Krause "failed to present evidence or arguments sufficient to prove that his statements were protected by" any privileges, the court decided that Krause failed to carry his burden.

¶29 UPEPA provides a party with an immediate right to appeal the denial of a special motion for expedited relief. *See* UTAH CODE § 78B-25-109(1) ("A moving party may appeal as a matter of right from an order denying, in whole or in part, a motion under Section 78B-25-103."). Krause did just that.

## ISSUES AND STANDARDS OF REVIEW

¶30 Krause first contends the district court erred when it concluded that UPEPA does not apply to Mackey's causes of action. "The proper interpretation and application of a statute is a question of law reviewed for correctness." *State v. Robertson*, 2017 UT 27, ¶ 14, 438 P.3d 491 (cleaned up).

¶31 Krause next argues that the district court erred when it viewed the facts and all reasonable inferences drawn from the facts in a light most favorable to Mackey. Krause asserts that the court "ignored Utah law and the plain language of UPEPA." "A district court's interpretation of a statute and our caselaw presents questions of law that we review for correctness." *State v. Cooke*, 2025 UT 6, ¶ 19, 567 P.3d 541.

¶32 Krause also challenges the district court's conclusion that Mackey established a prima facie case for each cause of action. "We review prima facie determinations for correctness." *State v. Clara*, 2024 UT 10, ¶ 30, 546 P.3d 963.

¶33 Krause last asserts that the district court erred when it determined that Krause failed to carry his burden to establish that Mackey's claims lack legal viability. Whether a plaintiff failed to state a cause of action upon which relief can be granted, and whether there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, are questions of law that we review for correctness. *See Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 9, 104 P.3d 1226; *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 15, 116 P.3d 271.

## ANALYSIS

¶34 "The Utah Legislature enacted the Citizen Participation in Government Act," an anti-SLAPP statute, in 2001. *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 36, 116 P.3d 323; *see also* Prevention of Retaliatory Lawsuits, H.B. 112, 2001 Leg., Gen. Sess. (Utah 2001). Broadly speaking, "[a] SLAPP suit is a meritless lawsuit that a party initiates primarily to chill a defendant's exercise of his or her . . . free speech rights." *Stubbs v. Strickland*, 297 P.3d 326, 329 (Nev. 2013) (en banc); *see also Am. Studies Ass'n v. Bronner*, 259 A.3d 728, 733 (D.C. 2021) ("[T]he term SLAPP is used to refer to an action filed by one side of a political or public policy debate aimed to punish or prevent opposing points of view." (cleaned up)). Anti-SLAPP statutes "provide[] procedural mechanisms to thwart such suits." *Bronner*, 259 A.3d at 733.

¶35 In 2023, the Legislature replaced the Citizen Participation in Government Act with UPEPA. *See* Public Expression Protection Act, S.B. 18, 2023 Leg., Gen. Sess. (Utah 2023). UPEPA is also an anti-SLAPP law. *See generally* Utah Code §§ 78B-25-101 to -115. UPEPA is designed to allow "early adjudication of baseless claims aimed at preventing an individual from exercising the constitutional right of free speech."[5] *Dimension Townhouses, LLC v. Leganieds, LLC*, No. 84969-7-I, 2024 WL 226768, at *4 (Wash. Ct. App. 2024). This is our first opportunity to interpret and apply UPEPA.

¶36 UPEPA allows a defendant to "file a special motion for expedited relief to dismiss" a cause of action or part of a cause of action based on the defendant's

---

[5] The Uniform Law Commission, also known as the National Conference of Commissioners on Uniform State Laws, drafted UPEPA. As of May 2025, eleven states, including Utah, have adopted some form of the model act. Jay Adkisson, *Another Victory For Free Speech: Montana Adopts Uniform Public Expression Protection Act*, Forbes (May 8, 2025), https://www.forbes.com/sites/jayadkisson/2025/05/08/another-victory-for-free-speech-montana-adopts-uniform-public-expression-protection-act/. Although UPEPA is a uniform law, not every state has enacted it as the Uniform Law Commission drafted it. *See id.*

(a) communication in a legislative, executive, judicial, administrative, or other governmental proceeding;

(b) communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or

(c) exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or Utah Constitution, on a matter of public concern.

UTAH CODE §§ 78B-25-102(2), -103. UPEPA instructs that it "shall be broadly construed and applied to protect the exercise of the right of freedom of speech and of the press, the right to assemble and petition, and the right of association." *Id.* § 78B-25-111.

¶37   When faced with a special motion for expedited relief, "the court shall consider the pleadings, the motion, any reply or response to the motion, and any evidence that could be considered in ruling on a motion for summary judgment under Utah Rules of Civil Procedure, Rule 56." *Id.* § 78B-25-106. UPEPA directs courts to

dismiss with prejudice a cause of action, or part of a cause of action, if:

(a) the moving party establishes under Subsection 78B-25-102(2) that this chapter applies;

(b) the responding party fails to establish under Subsection 78B-25-102(3) that this chapter does not apply; and

(c) either:

(i) the responding party fails to establish a prima facie case as to each essential element of the cause of action; or

(ii) the moving party establishes that:

(A) the responding party failed to state a cause of action upon which relief can be granted; or

(B) there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

*Id.* § 78B-25-107(1).

¶38   UPEPA thus establishes a three-step process to evaluate a special motion for expedited relief. The first step requires the court to determine whether UPEPA applies to all or part of the challenged causes of action. The second step places the burden on the plaintiff to demonstrate that there is a prima facie case for each element of the claims under review. The third step permits the defendant to either show that the plaintiff cannot state a cause of action or that there is no genuine issue of material fact that would prevent entry of judgment for the defendant.

¶39   The district court denied Krause's special motion for expedited relief. The court concluded that UPEPA "instruct[ed] courts to use the same analysis employed when deciding motions for summary judgment under rule 56 of the Utah Rules of Civil Procedure." (Citing *Id.* § 78B-25-106.) Because of that, "the trial court view[ed] the facts and reasonable inferences drawn therefrom in a light most favorable to" Mackey, the "nonmoving party." *See Sur. Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 37, 10 P.3d 338. The court then determined that Krause failed to show that UPEPA applied to Mackey's causes of action. It then concluded that even if UPEPA applied, Mackey established a prima facie case as to each claim. Finally, the court concluded that Krause failed to demonstrate that Mackey's claims lacked legal viability.

¶40   Krause contends that the district court erred in four ways. He first argues that UPEPA applies to Mackey's claims. He next asserts that the court improperly viewed the facts, and all reasonable inferences drawn from the facts, in Mackey's favor. He next maintains that Mackey failed to state a prima facie case as to each of his causes of action. And he contends that none of Mackey's claims are legally viable. Should we agree and reverse, Krause also requests costs, reasonable attorney fees, and reasonable litigation expenses related to the motion.

I.   THE DISTRICT COURT ERRED WHEN IT DETERMINED THAT KRAUSE FAILED TO SHOW THAT UPEPA APPLIES TO MACKEY'S CAUSES OF ACTION

¶41   The district court concluded that Krause failed to establish that UPEPA applies to Mackey's claims. The court determined that Krause did not show that Mackey's causes of action were based on his

(a) communication in a legislative, executive, judicial, administrative, or other governmental proceeding;

(b) communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or

(c) exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or Utah Constitution, on a matter of public concern.

UTAH CODE § 78B-25-102(2).

¶42 By its plain language, UPEPA applies to a claim based on any statement made in certain government proceedings, statements made outside those proceedings if they relate to an issue under consideration in those proceedings, and any statement made anywhere on a matter of public concern. The moving party bears the burden of demonstrating that UPEPA applies to the causes of action she seeks to dismiss. *See id.* § 78B-25-107(1).

¶43 The district court determined that UPEPA did not apply to Mackey's causes of action because Krause's comments did not deal with a matter of public concern. The court reasoned that Krause had failed to establish "that his comments were made in an effort to contribute to the public debate about child abuse." UPEPA does not define the term "public concern." So the district court borrowed a definition from California. The California Court of Appeals has held that "it is not enough that [a] statement refer to a subject of widespread public interest; [rather,] the statement must in some manner itself contribute to the public debate." *Wilbanks v. Wolk*, 17 Cal. Rptr. 3d 497, 506 (Cal. Ct. App. 2004).

¶44 The district court took that California definition and examined "the content, form, and context of the statements." The district court reasoned that Krause's investigation "focused entirely on" Mackey, "the information he gathered was used to support the allegations of abuse he levied against" Mackey, and "his comments at the . . . board meeting were specifically aimed at forcing the UMA administration to 'reconcile' the [Mackey] situation within 30 days." The district court held that this did not contribute to the debate on an issue of public concern.

¶45 Krause asserts that this was error because "a parent going to a school board meeting to raise concerns about the conduct of a teacher is precisely the appropriate public forum for a public debate about the conduct of a teacher."

¶46 Krause cites *Ogden Bus Lines v. KSL, Inc.*, 551 P.2d 222 (Utah 1976), to support the conclusion that his statements were related to a matter of public concern. That case resulted from a collision between an Ogden Bus Lines bus, loaded with school children, and a dump truck. *Id.* at 223. KSL published an editorial stating that "many Utahns must have been shocked when they learned that the driver of the school bus . . . has been charged with driving on a revoked license." *Id.* We observed that "problems affecting our schools are matters in which the public has a legitimate interest." *Id.* at 224.

¶47 This observation was, in a word, dicta. *See State v. Robertson*, 2017 UT 27, ¶¶ 26–27, 438 P.3d 491 (explaining that dicta is nonbinding language in a court's opinion "made casually and without analysis, where the statement is uttered in passing . . . , or where it is merely a prelude to another legal issue that commands the court's full attention" (cleaned up)). To be sure, there are a surfeit of issues surrounding Utah's public schools that are matters of public concern. The bus-safety issues in *Ogden Bus Lines* undoubtedly qualified. But reason and experience dictate that there are also many issues related to a public school that would not rise to the level of public concern. To be a matter of public concern, it is not enough to simply reference a public school.

¶48 But this does not answer the question of what a party needs to show to demonstrate that speech is related to a matter of public concern. Somewhat surprisingly, we have never explained what it means for speech to be related to "a matter of public concern" in the defamation context. Somewhat less surprisingly, on at least a couple of occasions, we have simply asserted that something was a matter of public concern without explaining why. *See e.g., Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 902 (Utah 1992) (concluding that "[a]llegations of misconduct against a local doctor and nurse are certainly matters of public concern" without further analysis); *Cox v. Hatch*, 761 P.2d 556, 560 (Utah 1988) (stating that "[t]he plaintiffs' assertion clearly pertains to a matter of public concern, as that term is used in" *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), but declining to adopt or opine on any definition).

¶49 The United States Supreme Court has held that speech deals with matters of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). At least one court interpreting its state's version of UPEPA has applied the Supreme Court's definition to determine whether "a complaint is based on the individual's exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or Washington [S]tate Constitution, on a matter of public concern." *M.G. v. Bainbridge Island Sch. Dist. #303*, 566 P.3d 132, 145 (Wash. Ct. App. 2025) (cleaned up); *see also id.* ("Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community.").

¶50 We similarly adopt the Supreme Court's definition. We also adopt its approach to determine whether speech is of public or private concern, which is to "examine the content, form, and context of that speech, as revealed by the whole record." *Snyder*, 562 U.S. at 453 (cleaned up).

¶51 Krause's statements, viewed in context, are related to a matter of public concern. A parent's concern about a teacher verbally and physically abusing his students "can be fairly considered as relating to [a] . . . concern to the community." *Id.* (cleaned up). It is not a leap of logic to conclude that the community at large would share a concern about a public-school teacher assaulting a student and the potential danger such a teacher might pose to the student body at large. This applies not only to the statements Krause made at the board meeting but also to the statements Krause made to Orris after the meeting (on the phone and in an in-person, private meeting).

¶52 Because Mackey's causes of action are asserted against Krause based on Krause's exercise of protected activity on a matter of public concern, the district court erred when it held that UPEPA does not apply to Mackey's claims.[6]

_____

[6] The parties also dispute whether Mackey's causes of action are asserted against Krause based on Krause's "communication in a

(continued . . .)

II. THE DISTRICT COURT CORRECTLY VIEWED THE FACTS AND ALL REASONABLE INFERENCES DRAWN FROM THE FACTS IN MACKEY'S FAVOR

¶53 The district court viewed the facts and all reasonable inferences drawn from the facts in Mackey's favor when it evaluated Krause's motion. The court reasoned that Utah Code section 78B-25-106 "instructs courts to use the same analysis employed when deciding motions for summary judgment under" rule 56 of the Utah Rules of Civil Procedure. And since those are the inferences the court would draw on a motion for summary judgment, it put them to work here. Krause asserts this misinterpreted the law.

¶54 Utah Code section 78B-25-106 directs that "[i]n ruling on a motion under Section 78B-25-103, the court shall consider the pleadings, the motion, any reply or response to the motion, and any evidence that could be considered in ruling on a motion for summary judgment under Utah Rules of Civil Procedure, Rule 56." That provision thus tells the court what it can consider when it evaluates a special motion for expedited relief on the merits. But the statute is silent on whether courts should view the facts and all reasonable inferences drawn from the facts in any particular way. *See* UTAH CODE § 78B-25-106. This legislative silence means we default to our normal practices.

¶55 Stated differently, UPEPA contains nothing from which we could conclude that the Legislature intended to disturb the regular inferences that we afford the nonmoving party on a motion to dismiss or a motion for summary judgment. Accordingly, a court presented with a UPEPA special motion should "review the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Christensen & Jensen, P.C. v. Barrett & Daines*, 2008 UT 64, ¶ 19, 194 P.3d 931; *see Sur. Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 37, 10 P.3d 338; *see also 1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP*, 2021 UT 15, ¶ 43, 493

---

legislative, executive, judicial, administrative, or other governmental proceeding" and his "communication on an issue under consideration or review" in the enumerated proceedings. UTAH CODE § 78B-25-102(2)(a), (b). But because UPEPA applies to a plaintiff's causes of action so long as one of the categories in Utah Code subsection 78B-25-102(2) is satisfied, we do not weigh in on that fight.

P.3d 580 (explaining the standard of review we apply on motion to dismiss).

¶56 Krause contends otherwise, arguing that in defamation cases, we do not afford the nonmoving party the benefit of "inferences that may be reasonably drawn" from the facts. *See Jacob v. Bezzant*, 2009 UT 37, ¶ 18, 212 P.3d 535. Krause's read on our caselaw extends too far. It is true that we "review[] claims of defamation" differently. *See id.* The "presence of the First Amendment demands a subtle although significant variation in the treatment of inferences drawn from undisputed facts." *Id.* (cleaned up). But this is limited to determining whether statements are capable of defamatory meaning. *See id.* (explaining that reviewing courts "must look to the context of the allegedly defamatory statement and then, in a nondeferential manner, *reach an independent conclusion about the statement's susceptibility to a defamatory interpretation*" (cleaned up) (emphasis added)).

¶57 It follows that when courts determine whether statements are capable of defamatory meaning, we do not indulge the plaintiff the "inferences that may be reasonably drawn from the statements in favor of a defamatory meaning." *Id.* But when engaging in most other defamation-related inquiries, we do extend those inferences. *Id.* The district court did not err when it hewed to this approach.

III. THE DISTRICT COURT ERRED IN PART WHEN IT CONCLUDED THAT MACKEY ESTABLISHED A PRIMA FACIE CASE FOR EACH OF HIS CLAIMS

¶58 Once a court determines that UPEPA applies, the court assesses whether "the responding party . . . establish[ed] a *prima facie case* as to *each essential element* of the cause of action." *See* UTAH CODE § 78B-25-107(1)(c)(i) (emphasis added). In non-UPEPA contexts, we have said that "to establish a *prima facie* case[,] [a] plaintiff must present some competent evidence on every element needed to make out [a] cause of action." *Winegar v. Slim Olson, Inc.*, 252 P.2d 205, 206 (Utah 1953); *see also Burton v. Youngblood*, 711 P.2d 245, 249 (Utah 1985) (stating that "[t]o make out a prima facie case, [a plaintiff] must show compliance with *all* of the . . . elements" of a cause of action).

*A. Defamation*

¶59 To prevail on a claim for defamation, the plaintiff must show that the defendant "published . . . statements concerning him, that the statements were false, defamatory, and not subject to any

privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *See West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994) (cleaned up); *Mathews v. McCown*, 2025 UT 34, ¶ 39 & n.7, __ P.3d __.

1. Publication

¶60 The district court concluded that the evidence Mackey submitted was sufficient to establish that Krause published statements that referred to Mackey. "Before defamatory statements may be regarded as actionable, a party must show that the statements refer to some ascertained or ascertainable person." *Pratt v. Nelson*, 2007 UT 41, ¶ 52, 164 P.3d 366 (cleaned up). "A party may show this by directly being named, or so intended from the extrinsic facts and circumstances." *Id.* (cleaned up). Krause argues that the district court erred because Mackey failed to present evidence that Krause's statements referred to him.

¶61 It is undisputed that Krause did not identify Mackey by name at the board meeting. Krause latches onto that fact and contends that "there is no evidence that, based on the context, Mackey's identity could have been understood at the meeting." Krause characterizes his board meeting statements as "vague." And he asserts that "Mackey provided no evidence that Krause actually spoke to any individual parent or student," "no evidence of what might have been said by Krause to any of those alleged individuals," and "no evidence that the substance of the conversation was defamatory in nature."

¶62 Even so, the district court correctly concluded that Mackey stated a prima facie case on the publication element. There was evidence before the court that at least one person at the UMA board meeting—Orris—knew to whom Krause was referring. Although Orris testified that he did not know which UMA instructor Krause was referring to during the meeting, it is undisputed that Orris learned that Krause had been talking about Mackey three days after the meeting.

¶63 Krause suggests that Mackey needed to show that at the time the board meeting statements were made, Orris knew who Krause was referring to. But Krause fails to cite any authority that supports this conclusion. In fact, for statements to be regarded as actionable, we allow parties to "show that the statements refer to some ascertained or *ascertainable* person." *Id.* (cleaned up) (emphasis added). This means that the recipient need not know

who the subject of the statements is at the time the statements are made. The district court correctly concluded that Mackey met his burden on this element.

### 2. Falsity

¶64 The district court also concluded that Mackey presented sufficient evidence from which a trier of fact could conclude that Krause's allegations of abuse were false. To support this conclusion, the court pointed to the Lehi Police and DCFS's closures of their investigations into Mackey. Their investigations "show[ed] that DCFS and the police spoke to the students named by Defendant as victims of abuse and both students supported the basic facts of the allegations but denied being injured or abused by" Mackey.

¶65 Krause, relying on the same evidence, argues that his reports were "substantially true," and "Utah law does not permit recovery for alleged[ly] defamatory statements that are substantially true." (Citing *Davidson v. Baird*, 2019 UT App 8, ¶ 34, 438 P.3d 928; *Bustos v. A & E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011).) Krause specifically asserts that "the evidence shows that the facts of the physical incidents reported to school officials by Krause were borne out by the investigations."

¶66 Krause does not dispute that the following incidents were the subject of DCFS's and the Lehi Police's investigations: (1) "Sergeant Mackey had a rock on his desk and picked up the rock and threw it at a student and hit him in the stomach, rib cage area"; and (2) "Sergeant Mackey had wrestled with [a] student, had him in a headlock[,] . . . [and] proceeded to give the student what I would call a knuckle rub . . . [and] that he [then] threw a student across the room over several desks into the wall."

¶67 DCFS interviewed a student who had witnessed the first incident, and the student said that "one time Mr. Mack[e]y pretended to throw something, but [it] accidentally slipped out of his hand and it hit" another student "on the lower right side." Another student DCFS interviewed said that the incident was "an accident"—that is, Mackey had been "swinging something[,] and it flew out of his hand." Viewed in the light most favorable to Mackey, the DCFS investigation notes do not match the incident as Krause reported it to school officials. The allegation Krause reported to Orris was that Mackey picked up a rock and intentionally threw it at a student. DCFS's notes, in contrast, support that the incident was an accident, not one in which Mackey

intended to cause any student harm. The district court did not err when it granted Mackey the benefit of favorable inferences and concluded that Mackey could show a prima facie case of falsity. A trier of fact might ultimately come to a different conclusion, but for the purposes of a UPEPA motion, the district court correctly concluded that Mackey had done enough.

¶68 The same analysis holds true for allegations about Krause's statement that Mackey had thrown a student across a room. The evidence before the district court showed that DCFS interviewed the student with whom Mackey had allegedly wrestled. That student reported that Mackey "rubbed [the student's] head jokingly and then when [the student] backed away . . . he lost his balance." Again, a trier of fact might see it differently at some point, but the district court did not err when it concluded that Mackey had stated a prima facie case of falsity at this stage in the proceedings.

### 3. Fault

¶69 The district court next concluded that Mackey submitted sufficient evidence from which a trier of fact could find that Krause did not act with reasonable care when ascertaining the truth or falsity of his statements. (Citing RESTATEMENT (SECOND) OF TORTS § 580B (AM. LAW. INST. 1977).) The court applied the reasonable care standard because it concluded that Mackey was a private plaintiff.[7] And Krause, in the district court's view, "used second-hand reports of 'abuse' as a basis to investigate" Mackey, used those reports "to question UMA students and parents during the investigation," "reported the findings of his investigation as facts during the . . . UMA board meeting," and "supported his factual assertions by providing Orris with a report from his investigation."

¶70 Krause first argues this was error because there was no evidence before the court that he knew the statements were false or acted with reckless disregard to their truthfulness. According to Krause, this is because the "reported instances turned out to be accurate." But as we have discussed, the Lehi Police and DCFS investigations are prima facie evidence that Krause's allegations

---

[7] The district court concluded that the evidence showed that Mackey "was a teacher employed by UMA, was not involved in any activities that would have raised his profile in the UMA community, and . . . was not otherwise well known to the public at large."

were not substantially true. *See supra* ¶¶ 67–68. Moreover, Krause does not dispute the district court's conclusion that Mackey is a private plaintiff.[8] Krause's argument, based on the actual malice standard for a public plaintiff, is misplaced.

¶71 Krause next argues that there was no evidence before the court that he acted negligently when he brought his concerns about Mackey to the school board. He argues that taking "his legitimate concerns about a teacher at his children's school to the school board that oversees that teacher" was reasonable. In some instances, that might be the case. But here, there was evidence that Krause had not taken sufficient efforts to confirm that the allegations he learned from his daughter were based in fact before he publicly aired them. Although Krause's notes contain an "Interview List," for example, the parties dispute whether Krause actually conducted the interviews. Indeed, Krause himself put evidence before the district court that he had provided the list to Orris after the school board meeting so that Orris could contact others to discuss Mackey. The district court did not err when it concluded that Mackey demonstrated a prima facie claim that Krause failed to act reasonably to ascertain the truth or falsity of the statements before publishing them. The ultimate trier of fact might see this differently, but Mackey met his UPEPA burden on this element.

4. Damages

¶72 The district court also concluded that Mackey had put forward prima facie evidence that Krause's statements damaged

---

[8] In the realm of defamation law, not all persons are treated equally. *O'Connor v. Burningham*, 2007 UT 58, ¶ 8, 165 P.3d 1214. Statements directed at public officials and public figures require proof that the speaker acted with actual malice—that is, with knowledge that the statement was false or with reckless disregard for whether it was false or not. *Id.*; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). But where a case deals with a matter of public concern, "a defamation plaintiff who is not a public figure must still establish negligence on the part of the defendant" to recover damages. *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 24 n.5, 221 P.3d 205 (cleaned up). To discern whether a plaintiff has established negligence, we ask whether a defendant acted reasonably in verifying the truth or falsity of a statement before publishing it. *See Seegmiller v. KSL, Inc.*, 626 P.2d 968, 974 (Utah 1981).

him. The district court explained that "[a]lthough Orris was prevented from fully testifying exactly how much [Krause's] allegations influenced the decision to terminate" Mackey, Orris's deposition testimony "and the proximity in time between [Krause's] statements and [Mackey's] termination would be sufficient to establish a prima facie case that" Krause's statements damaged Mackey.

¶73 Mackey stated a prima facie case of damages. Mackey testified that three days after the board meeting, he met with UMA Interim Principal Schino, who told Mackey he was suspended with pay pending allegations of physical contact with students. Less than a week later, Mackey received a letter in the mail from UMA, dated four days after the board meeting, and one day after Krause's phone call with Orris, terminating Mackey's employment.

¶74 Mackey asserts that the "combination of [his] termination from UMA, followed closely by the investigations into [his] alleged abusive conduct by Lehi Police Department and DCFS," has also caused him "significant emotional distress and trauma." He also reports that the allegations "have harmed [his] reputation among those in the UMA community," as well as his "relationship with [his] family." Moreover, he has "been unable to obtain a new job following [his] termination from UMA."

¶75 Krause argues that Mackey failed to show a causal connection between Krause's publication of the statements and Mackey's termination from UMA. He asserts that "Mackey's own conduct resulted in his dismissal from UMA." For support, he points to evidence showing that UMA had warned Mackey about his behavior with students and staff before Krause made his allegations.

¶76 But Mackey presented other evidence to support his prima facie case for damages. Three days after the board meeting, Schino told Mackey that he was suspended with pay *pending allegations* of his physical contact with students. (Emphasis added.) The day after that, UMA terminated Mackey's employment. After Mackey met with Schino, but before UMA terminated Mackey's employment, Orris talked about Krause's allegations with the board chair at the time. This was sufficient to permit the district court to conclude that Mackey stated a prima facie case that Krause's comments damaged Mackey. While it appears that Krause

will be able to present evidence to support a different narrative, this is not a basis to dismiss the cause of action at this point.[9]

### 5. Privilege

¶77 The district court concluded that at "the early stages of a defamation suit, the plaintiff does not bear the burden to prove that the defamatory statements were [not] protected under an absolute or qualified privilege." The district court nevertheless examined whether Mackey had presented evidence on the privilege question, ultimately concluding that Mackey had forwarded some evidence that could defeat *some* of the privileges Krause asserted in his answer. But the district court summarily dealt with other defenses by stating that because it "found that UPEPA does not apply to Defendant's statements and, based on the evidence before this [c]ourt, it is reasonable to conclude that the same result would be reached for the other privileges alleged in the Defendant's answer."

¶78 Krause argues that the district court erred when it held that Mackey need not establish a prima facie case that Krause's statements are not subject to privilege to survive a UPEPA motion.

¶79 We have, somewhat confusingly, said at times that a plaintiff must plead lack of privilege to "state a claim for defamation," *see West*, 872 P.2d at 1007 (cleaned up), and, on other occasions, that privilege is an affirmative defense to defamation, *see Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 59 (Utah 1991). We have since clarified that when we have said things like, "to state a claim for defamation," a plaintiff must show that the statements are "not subject to privilege," we did not mean that plaintiffs needed to anticipate the privileges the defendant might assert and plead that the alleged defamatory statements are not subject to those privileges. *See Mathews*, 2025 UT 34, ¶¶ 39 & n.7, 124, 128, 143.

---

[9] The parties also dispute whether Krause's statements are per se defamatory. Because we conclude that Mackey has stated a prima facie case as to damage, we need not determine whether the statements amounted to defamation per se. While we have held "that some words are of such common notoriety that the injury to the plaintiff can be presumed from the words alone, the legal significance of concluding that a plaintiff has alleged statements that are per se defamatory is that the plaintiff need not allege damages to sustain their claim." *Mathews*, 2025 UT 34, ¶ 89 n.15 (cleaned up). Here, Mackey put forward enough evidence for us to conclude he stated a prima facie case as to damage.

Rather, plaintiffs bear the "ultimate burden of proof when the affirmative defense of privilege is raised in a defamation case." *Id.* ¶ 130 (cleaned up). But this clarification came too late to be of any help to the district court in this matter.

¶80 The special motion UPEPA authorizes presents an interesting twist on what we said in *Mathews.* Because the success of a UPEPA motion turns on whether a plaintiff can make out a prima facie case, it stands to reason that the plaintiff should be the one who needs to demonstrate a prima facie case that privilege does not protect the challenged statements. This comports with UPEPA's goal of weeding out meritless defamation claims at an early stage of the proceedings. Indeed, it would undermine the statute's purpose if a plaintiff did not have to point to evidence that demonstrates a prima facie case that the statements are non-privileged to survive a special motion premised on privilege.[10]

¶81 This means that the district court, quite understandably given the state of our caselaw at the time, erred to the extent it placed that burden on Krause. Although Mackey was not required to allege facts addressing privilege in his complaint, when Krause filed the UPEPA motion, the burden shifted to Mackey. Mackey needs to show a prima facie case that the allegedly defamatory statements were not subject to privilege or that Krause abused the privilege. *See id.* ¶ 124 n.19.

¶82 Mackey contends that UPEPA does not require him to make out a prima facie case that the challenged statements are not privileged. Mackey reasons that absence of privilege is not part of his initial pleading burden and UPEPA only requires prima facie evidence "as to each *essential* element of the cause of action." (Quoting UTAH CODE § 78B-25-107(1)(c)(i) (emphasis added).) Mackey's contention fails because while lack of privilege may not be a pleading burden, once raised, it is an element that a plaintiff must prove to prevail. In other words, lack of privilege does not cease to be essential just because it is not part of a plaintiff's pleading burden. To defeat the UPEPA special motion, Mackey

---

[10] We understand that at times plaintiffs may find themselves at an informational disadvantage at this early stage of the proceeding. Our concerns are somewhat mollified by UPEPA's provisions that permit early limited discovery when an expedited motion is filed. We trust the district courts to have this dynamic well in mind when a party requests UPEPA-related discovery.

needs to demonstrate a prima facie claim that the statements are not subject to the privileges Krause argues are at play.

¶83   The district court started to analyze the evidence before it that spoke to privilege, but it eventually stopped short. The district court reasoned that it did not need to rule out every privilege Krause alleged because UPEPA did not cover Mackey's claims to begin with. The court also gestured generally to "evidence before th[e] [c]ourt" that made it "reasonable to conclude" those unaddressed privileges would meet the same fate as the others.  As we have explained, UPEPA does indeed apply to Mackey's causes of action and that undercuts the district court's analysis. *See supra* ¶¶ 41-52. And because the district court opted not to complete its review of the evidence before it, we are left without an alternative basis on which we might affirm its privilege ruling. Accordingly, we vacate and remand for the district court to reassess the question of whether Mackey can satisfy UPEPA's prima facie requirement on the lack of privilege element.

¶84   In summary, the district court correctly concluded Mackey stated a prima facie case as to publication, falsity, fault, and damage, but we vacate the denial of the special motion and remand to the court to decide whether Mackey stated a prima facie case on the privilege element.[11] *See* UTAH CODE § 78B-25-107(1)(c)(i).

---

[11] We note that the district court did not evaluate whether Krause's statements were capable of defamatory meaning when it determined whether Mackey stated a prima facie defamation case. *See West*, 872 P.2d at 1007–08. When it listed the elements of defamation, the court omitted "defamatory." That is perhaps understandable because we have not been consistent when we describe the elements of a defamation claim. Sometimes we omit "defamatory" as an element a plaintiff must prove to prevail on her claim. *See DeBry v. Godbe*, 1999 UT 111, ¶ 8, 992 P.2d 979; *Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535. Other times, we include it. *See Berry v. Moench*, 331 P.2d 814, 818 (Utah 1958); *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988); *West*, 872 P.2d at 1007–08; *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 18 n.2, 116 P.3d 271; *Jensen v. Sawyers*, 2005 UT 81, ¶ 35, 130 P.3d 325; *Pratt*, 2007 UT 41, ¶ 51; *Mathews*, 2025 UT 34, ¶ 39. In hopes of putting any confusion to rest, we clarify that, indeed, a defamation plaintiff must establish that a statement is defamatory.

### B. *Intentional Infliction of Emotional Distress*

¶85   The district court held that Mackey established a prima facie case of IIED. Krause contends that his actions do not demonstrate the "outrageous conduct" that IIED requires. He argues that the district court "must have based this conclusion on improper inferences in Mackey's favor, because, on their face, Krause's notes do not support it."

¶86   In *Samms v. Eccles*, we adopted section 46 of the Restatement (Second) of Torts and held that IIED requires proof that

> the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

358 P.2d 344, 346–47 (Utah 1961), *abrogated on other grounds by Johnson v. Rogers*, 763 P.2d 771, 778–79 (Utah 1988).

¶87   It is difficult to satisfy the "outrageous conduct" element. In this context, "outrageous conduct" means "conduct that evokes outrage or revulsion; it must be more than unreasonable, unkind, or unfair." *Prince v. Bear River Mut. Ins.*, 2002 UT 68, ¶ 38, 56 P.3d 524 (cleaned up). It is not enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. L. INST. 1965). As to this element, we have never "softened the Restatement's requirement of extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community." *Retherford v. AT&T Commc'ns of the Mountain States, Inc.*, 844 P.2d 949, 977 n.19 (Utah 1992) (cleaned up).

¶88   The district court concluded that Mackey cleared the threshold in part because of Krause's notes. It described them as "replete with the use of inflammatory language to describe [Mackey's] interactions with students, referring to multiple incidents in which [Mackey] verbally 'assaulted,' 'humiliated,' and

26

'degraded' students." The court viewed this "inflammatory language" as evidence that Krause "may not have intended his investigation to reveal the truth" about Mackey's conduct.

¶89 Mackey maintains that the district court got it right. He argues that his complaint "tells a story that is particularly outrageous." He asserts that "Krause's fabrications, when packaged together in a public meeting and subsequent private interviews with the school superintendent for the sole purpose of destroying Mackey's career, are straightforwardly outrageous." Mackey also characterizes Krause's concerns as "highly dubious, given that both purported victims remained amiable toward Mackey," each reporting that they liked Mackey.

¶90 Krause's notes demonstrate that he was concerned about Mackey. He produced a risk assessment, documented specific instances of concern, and made a list of potential charges. Even assuming Krause's notes contained exaggeration and inflammatory rhetoric, the district court's conclusion that a trier of fact could conclude that Krause's conduct was "atrocious[] and utterly intolerable in a civilized community," *Retherford*, 844 P.2d at 977 n.19 (cleaned up), is incorrect.

¶91 In *Retherford*, we held that the plaintiff satisfied the showing of outrageous and intolerable conduct because she had alleged an ongoing pattern of intimidation and harassment and that after she filed a sexual harassment complaint, her colleagues harassed and intimidated her. *See id.* at 975, 978; *see also Cabaness v. Thomas*, 2010 UT 23, ¶¶ 40–45, 232 P.3d 486 (holding that an ongoing and continuous pattern of "abusive, intimidating, and harassing behavior from" a workplace supervisor could be considered outrageous and intolerable), *abrogated on other grounds by Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, 424 P.3d 897. We have also sustained a plaintiff's IIED claim where she alleged that her apartment manager "forcefully evicted her and her children when she held the premises under lease and had tendered the rent due, that he retained all of her personal possessions without contractual or judicial sanction, and that all of this was done intentionally and with malice." *Pentecost v. Harward*, 699 P.2d 696, 700 (Utah 1985) (cleaned up) (denying defendant's motion for summary judgment).

¶92 Although we have recognized that "publication of falsehoods concerning an individual *could* constitute extreme and outrageous conduct warranting a remedy for the ensuing

emotional distress," *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 906 n.35 (Utah 1992) (emphasis added), the evidence before the district court does not support that Krause's actions were "extraordinarily vile[,] . . . atrocious, and utterly intolerable in a civilized community," *see Retherford*, 844 P.2d at 977 n.19 (cleaned up). At least some courts addressing similar facts have reached the same conclusion. In *Dennis v. DeJong*, the court granted summary judgment to the defendant on the plaintiffs' IIED cause of action because the plaintiffs failed to show that the defendant's "false allegations of child abuse" amounted to "extreme and outrageous" conduct. 953 F. Supp. 2d 568, 600, 604 (E.D. Pa. 2013). And in *Lyles v. Micenko*, in which the defendants allegedly initiated a police complaint that led to a plaintiff's arrest, the court held that while "the events that occurred . . . , viewed in the light most favorable to the plaintiffs, are unfortunate, initiating a complaint with the police about them, even if false, is not conduct that rises to the level of 'outrageousness' as to be . . . utterly incomprehensible in a civilized society." 404 F. Supp. 2d 182, 184–85, 187 (D.D.C. 2005).

¶93 The district court's remit at this stage is to evaluate whether Mackey presented "some competent evidence" that Krause's actions met the high threshold for outrageousness. *See Winegar*, 252 P.2d at 206; *Burton*, 711 P.2d at 249. Mackey's notes, among the other evidence before the district court, do not satisfy that threshold. Even if Krause made his statements solely to seek retribution against Mackey, that conduct does not meet the high bar of "atrocious[] and utterly intolerable in a civilized community." *Retherford*, 844 P.2d at 977 n.19 (cleaned up). Mackey's failure to put forward that evidence on an essential element of his IIED cause of action made it susceptible to dismissal under UPEPA. We reverse the district court's denial of Krause's motion to dismiss the IIED claim.

### C. Abuse of Process

¶94 Mackey's abuse of process claim fares no better than his IIED cause of action. The district court concluded that the evidence Mackey presented supported his theory that Krause's statements were "expressly made to 'exact retribution'" against Mackey. The district court pointed to Krause's notes, concluding from them that Krause's investigation was "specifically aimed at gathering harmful information" about Mackey "to use as support for the statements he made at the" board meeting. From this, the court determined that "the evidence could establish" that Krause's

conduct "was prompted by the improper ulterior motive of 'exacting retribution' for [Mackey's] treatment of [Krause's] son."

¶95 "The misuse of legal process becomes actionable when it is used primarily to accomplish a purpose for which it is not designed." *Hatch v. Davis*, 2006 UT 44, ¶ 34, 147 P.3d 383 (cleaned up). The "essence" of the tort is "a perversion of the process to accomplish some improper purpose." *Crease v. Pleasant Grove City*, 519 P.2d 888, 890 (Utah 1974). The comments to the Restatement (Second) of Torts on abuse of process opine that the "usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." RESTATEMENT (SECOND) OF TORTS § 682 cmt. b (AM. L. INST. 1977).

¶96 In Utah, a claim for abuse of process requires the plaintiff to "allege both an ulterior purpose and a wilful act in the use of the process not proper in the regular conduct of the proceeding." *Hatch*, 2006 UT 44, ¶ 36 (cleaned up).[12] "To satisfy the 'wilful act' requirement, a party must point to conduct *independent of legal process* itself that corroborates the alleged improper purpose." *Id.* ¶ 39 (emphasis added). This is because it "is easy to slip into the conceptual trap of simply defining the 'wilful act' as the legal process that the tortfeasor pursues according to his ulterior motive." *Id.* ¶ 37. We have observed that this would render the willful act requirement "superfluous." *Id.*

¶97 *Hatch* is instructive. That case involved a beef between two residents of Boulder, Utah. *See id.* ¶1. Larry Davis managed Anasazi State Park. *Id.* ¶ 2. Julian Hatch applied for, but did not secure, a job at the park. *Id.* This rejection sparked a "ten-year campaign" wherein Hatch tried to get Davis fired. *Id.* It also led to an alleged assault outside the Boulder post office. *See id.* ¶ 3. Hatch sued Davis over the alleged assault. *Id.* Davis counterclaimed for abuse of process, malicious prosecution, and IIED. *Id.*

¶98 Davis premised his abuse of process claim on the multiple lawsuits Hatch had filed against Davis. *See id.* ¶ 35. We acknowledged that "there [was] no question" that Davis had alleged that "Hatch had instigated lawsuits against him for the improper purpose of engaging in a campaign of hate and terror

---

[12] We are unsure why the *Hatch* court preferred to use the British spelling of willful. We will, for reasons both patriotic and aesthetic, revert to the American spelling when not quoting from *Hatch*.

towards the residents of Boulder, most specifically toward Larry and Judy Davis." *Id.* This satisfied the "ulterior purpose" required for the tort. *See id.* ¶ 36 (cleaned up).

¶99  But we held that Hatch's motive alone was "not enough" to state an abuse of process claim. *See id.* The "tortfeasor must also have undertaken a 'wilful act.'" *Id.* ¶ 37. And we reasoned that there was "nothing in [the] allegations that distinguish[ed]" Hatch's conduct "from process that is merely accompanied by spite, ill-will, or any of the other less agreeable human emotions that frequently attach themselves to court papers." *Id.* ¶ 38. We worried that if we defined the willful act the tort requires to be "the legal process that the tortfeasor pursues according to his ulterior motive[,] . . . a party would only be required to link a bad motive to an event having the hallmarks of legal process to state a claim."[13] *Id.* ¶ 37.

¶100 Mackey alleges that Krause abused several legal processes. He first contends that Krause misused UMA's board meeting "to inflict damage and ruin the reputation of Mackey." But, even if we assume that speaking at a school board meeting is the type of process the tort protects from abuse, *cf. Rosser v. Rosser*, 2021 UT 71, ¶ 52, 502 P.3d 294, the evidence before the district court could not support the conclusion that Krause had taken a willful act "not proper in the regular conduct of the proceeding." *See Hatch*, 2006

---

[13] In *Hatch*, we gave only a single example of the type of action that would satisfy the willful act requirement. We cited a California case where a party used legal process to seize turkeys at the height of the Thanksgiving season to "force the payment of a debt." *Hatch*, 2006 UT 44, ¶ 39 (citing *Templeton Feed & Grain v. Ralston Purina Co.*, 446 P.2d 152, 155 (Cal. 1968) (en banc)). A review of *Templeton* suggests that the abuse of process was based on the defendant's knowledge that it did not possess a legitimate security interest in the birds and strategically seized them to force payment of a tangentially related debt. *See Templeton,* 446 P.2d at 155–56. The California Supreme Court held this provided sufficient evidence to permit the jury to decide that the abuse of process claim could fly. *See id.* We observed that the "payment demands" that accompanied the seizure were not "integral to the proceeding that resulted in the seizure of the turkeys, but they [corroborated] the perverse character of those proceedings." *Hatch,* 2006 UT 44, ¶ 39. This fact pattern embodies the Restatement's "usual" abuse of process case. *See supra* ¶ 93.

UT 44, ¶ 36 (cleaned up). We cannot find a principled basis to distinguish Krause's actions from those we held were insufficient for Davis to state a claim in *Hatch*.

¶101 Although the district court did not use the language of willful act, the court relied on Krause's notes as evidence that Mackey acted with the ulterior purpose of "exacting retribution." Mackey argues that Krause's notes "make clear that [Krause] began tracking Mackey's actions starting with Mackey's interactions" with Krause's son in September 2022. And Mackey further contends that the "notes then mischaracterize a number of innocent interactions in a nefarious manner, aimed solely at inciting fear and exaggerating the seriousness of Mackey's conduct, in retribution for Mackey's reprimand of" Cadet Krause. Krause's notes certainly show an individual who has serious concerns about Mackey, but they do not qualify as the sort of willful act that would separate Krause's course of conduct from "process that is merely accompanied by spite, ill-will, or any of the other less agreeable human emotions." *Id.* ¶ 38. That is, a trier of fact could not find that the notes corroborate the notion that Krause was seeking to pervert the public comment portion of the board meeting to accomplish some goal separate from the public comment section's purpose—raising concerns and asking questions about the school.

¶102 Mackey also bases his claim on "Krause's report to the Lehi Police Department." He argues that this alleged misuse of process is "based on the same hostile motivations" as his alleged misuse of UMA's board meeting. And he contends that "at this stage of the case, . . . a trier of fact could ultimately determine that Krause made such [a] report . . . for the ulterior purpose of exacting revenge on Mackey." Mackey again relies on Krause's notes to support the conclusion that Krause had an ulterior purpose, and he points to evidence showing that the police investigation "ultimately determined" that Mackey had not intended to throw a rock at a student. Even setting aside questions of whether Krause was the person who made a report to the police, we cannot distinguish this conduct from the conduct we found lacking in *Hatch*.

¶103 Finally, Mackey argues that Krause abused DCFS's process when he made a false report of abuse to Orris. Assuming without deciding that Krause's report to Orris, who reported the allegations to DCFS, counts as a process within the scope of the tort,

*cf. Rosser*, 2021 UT 71, ¶ 52, Mackey's claim fails for the same reasons as the other theories.[14]

### D. Tortious Interference

¶104 The district court concluded that Mackey stated a prima facie case on his tortious interference claim. The district court reasoned that Krause "interfered with [Mackey's] economic relationship with UMA" when he made "false reports of child abuse during the UMA board meeting." The court found that the "evidence support[ed] a finding that [Krause's] allegations at the meeting were defamatory and, as such, he was not engaged in conduct in which he was legally entitled to engage." The court also determined that the evidence showed that Krause's conduct "caused injury" to Mackey "when he was terminated from his job and was reported to the police and DCFS for abusing students" as the result of Krause's published allegations.

¶105 "To recover damages for tortious interference, a plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 65, 201 P.3d 966 (cleaned up); *see also C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶¶ 22–26, 437 P.3d 343. In this context, "improper means" is "conduct contrary to law—such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession." *C.R. England*, 2019 UT 8, ¶ 48.

¶106 The district court concluded that Mackey had established a prima facie case because defamation can be the improper means that gives rise to an intentional interference with economic relations claim. Indeed, we have acknowledged that defamation can be the improper means for an intentional interference claim. *See*

---

[14] Mackey also contends that Krause's calls and meetings with Orris constitute processes for purposes of this tort. The district court, however, did not sustain Mackey's abuse of process claim based on these processes, and we only "affirm a judgment on an alternative ground if it is apparent in the record." *Olguin v. Anderton*, 2019 UT 73, ¶ 20, 456 P.3d 760 (cleaned up). As this alternative ground is not apparent from the record, we do not affirm the district court on that basis.

*Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 36, 221 P.3d 205 ("Defamation would be a means contrary to the common law.").

¶107 Consequently, the intentional interference claim will rise or fall with Mackey's defamation cause of action. And, as discussed above, we cannot say at this point whether Mackey satisfied his UPEPA burden of establishing a prima facie case of defamation. This is because the district court still needs to evaluate whether Mackey can make out a prima facie case that Krause's statements were not privileged. We vacate the court's decision on this cause of action and remand.

## CONCLUSION

¶108 The district court erred when it concluded that UPEPA does not apply to the causes of action Mackey raised in his complaint. Mackey failed to state a prima facie case of intentional infliction of emotional distress and abuse of process, and the district court erred when it failed to grant the UPEPA motion to dismiss those claims. The district court did not err when it viewed the facts and all reasonable inferences drawn from the facts in Mackey's favor. We vacate the district court's denial of the special motion and remand so the district court can evaluate whether Mackey can point to evidence to state a prima facie case on the defamation and tortious interference causes of action. We reverse in part, vacate in part, and remand.

————————